## THE STYRIA, SCOPINICH, CLAIMANT, *v.* MORGAN.

### SAME *v.* PARSONS.

### SAME *v.* MALCOLMSON.

### SAME *v.* MUNROE.

CERTIORARI TO THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

Nos. 72, 73, 74, 75. Argued November 22, 25, 1901.—Decided May 19; 1902.

The Styria, an Austrian steamship sailing from Trieste *via* Sicilian ports to New York, took on board at Port Empedocle, Sicily, a quantity of sulphur for New York. Before sailing the master learned that war had broken out between Spain and the United States, and as sulphur was an article contraband of war, he had the sulphur all unloaded and warehoused at Port Empedocle before sailing. This court holds that the master of the Styria was justified in relanding and warehousing the contraband portion of the cargo, and that in so doing he had reasonable regard for the interests of both ship and cargo.

This court does not think that, in the subsequent circumstances, it was the master's duty to reship that cargo, and resume his voyage with the sulphur on board.

Four libels in admiralty were filed in the District Court of the United States for the Southern District of New York against the steamship Styria, to recover damages for the failure duly

to deliver at New York different lots of sulphur, owned by the libellants, shipped on board the Styria at Port Empedocle, the port of the town of Girgenti, in Sicily, April 21–24, 1898, and shortly afterwards relanded at the port of shipment because it had become contraband of war. The facts were substantially undisputed, and were as follows:

The Styria was an Austrian steamship, owned by the Austro-Americana Steamship Company, and Burrill & Sons of Glasgow were her managing agents. She sailed April 16, 1898, with some cargo, from Trieste *via* Sicilian ports for New York, and on April 21 reached Port Empedocle, Sicily, her second loading port. Her master began at once to load on board the sulphur in question, and by April 24 it was all on board, bills of lading therefor (containing the provisions copied in the margin[1]) had been signed, and the vessel cleared from the custom-house, and ready to proceed on her voyage to Messina and Palermo for a cargo of fruit, and thence to New York.

In the mean time, unknown to the master, war had broken out between the United States and Spain. On April 20, Congress passed, and the President approved, the joint resolution recognizing the freedom and independence of Cuba, and demanding that the government of Spain relinquish its authority in the island and withdraw its land and naval forces. 30 Stat. 738. On the same day the Spanish minister in Washington demanded and received his passports. On April 21, the Amer-

---

[1] To be delivered at the port of New York, "restraints of princes and rulers or people" and other specified perils "excepted; with liberty (in event of steamer putting back to this, or into any other port, or otherwise being prevented from any cause from commencing or proceeding in the ordinary course of her voyage) to ship or transship the goods by any other steamer."

"In case of blockade or interdict of the port of discharge, or if, without such blockade or interdict, the master shall consider it unsafe, for any reason, to enter or discharge cargo there, he is to have option of landing the goods at any other port which he may consider safe, at shipper's risk and expense, and on the goods being placed in charge of any mercantile agent or of British consul, and a letter being put into the post-office, addressed to the shipper and consignee, if named, stating the landing and with whom deposited, the goods to be at the shipper's risk and expense, and the master and owners discharged from all responsibility."

ican minister at Madrid was informed that the diplomatic re-
lations between the two governments were broken off, and he
left that same day.   On April 22, the first overt act of war,
the capture of the Spanish merchant steamship, the Buena
Ventura, was committed.   *The Buena Ventura,* 175 U. S. 384.
On April 25, Congress passed an act declaring that war had
existed since April 21.   30 Stat. 364, c. 189.   On April 25, the
Queen Regent of Spain issued a decree announcing the exist-
ence of war with the United States; authorizing the Royal
Navy, "in order to capture the enemy's ships, to confiscate the
enemy's merchandise under their own flag, and contraband of
war under any flag," to exercise the right of search on the high
seas and in the territorial waters of the enemy ; including, un-
der the denomination of contraband, "powder, sulphur, salt-
petre, dynamite, and every kind of explosive ;" and charging
the Minister of State and the Minister of Marine with the ful-
filment of this decree.

On April 23, the master of the Styria received a telegram
from Burrill & Sons, her managing agents, directing him not to
sail until further orders ; and on April 25 another telegram di-
recting him " to discharge whole cargo as quickly as possible."
The master had by this time learned that war existed, and that
sulphur was contraband.   He knew that his course would take
him within a few miles of the Spanish coast, in order to sight
the lighthouses ; and he had seen in an Italian newspaper that
Spanish men-of-war were looking for contraband goods, and
that a sulphur ship had been taken.   In obedience to the in-
structions from the managing agents, as well as because he saw
in the newspapers that the sulphur was contraband of war and
ne considered it unsafe to carry it, the master began to reland
the sulphur at Port Empedocle on April 27, and had it all un-
loaded and warehoused by May 7.   At the beginning of the
unloading on April 27, he gave notice in writing to the shippers,
and to the consignees named in the bills of lading, that "on
finding risky my passage to New York with the actual sulphur
cargo, for facts of war," he was discharging the cargo for the
account and risk of the shippers, "under care of the mercan-
tile agent, Mr. William Peirce, depositing the same in the

warehouses of Mr. Zenobia Urso here, and, if these are not sufficient, in the warehouses of the British consulate, faculty which I have in force in the bills of lading." On the same day, he gave notice in writing to the Austrian consul at Girgenti " that, by order of the representative of my owners, for facts of war," he was discharging and warehousing the sulphur from the Styria, for whom it might concern; and also gave notice in writing, through the Austrian consul, to the director general of the customs at Girgenti, that, having loaded the sulphur on the Styria, " and sulphur being declared contraband of war, war actually existing between Spain and the United States of America, in behalf of the present laws, I deem it in the interest of all whom it might concern to discharge the whole sulphur here on receiving the necessary permit from the customs;" and asking that duties might be remitted on reshipment. On April 30 and May 2, the shippers of the sulphur protested against the unloading; and on May 3 and 5, respectively, the master replied that he, " in discharging the goods, acted as was his right, and in the best interest of the goods, which is confirmed by the fact, published in the papers, and discussed in the Italian Parliament, that sulphur had been declared contraband of war by one of the belligerent powers." And at the conclusion of the unloading, on May 7, the master gave notice to the shippers that, as soon as they paid the expense incurred on their account, the sulphur would be delivered to them ; and to the consignees that the sulphur was lying in the warehouses at Port Empedocle, at the risk and expense of whom it might concern.

The exportation of sulphur is one of the principal industries of the island of Sicily, and immediately after the declaration of war Sicilian merchants urged the Italian Government to request Spain to exempt it from the list of contraband. The Giornale di Sicilia, a newspaper of Palermo, each issue of which had a double date, and was read by the master of the Styria on the day of its publication, contained, according to the translations in the record, the following information on the subject: On April 24–25, 1898, it was stated that the merchants of Messina had requested their deputy in the Italian Parliament to

urge the Government to induce Spain to exclude sulphur from being considered contraband of war; and that the deputy had been assured that the Minister for Foreign Affairs would telegraph to the Italian Ambassador in Madrid to obtain what was required from the Spanish authorities.   On April 26–27, it was stated that Spain included sulphur in the list of contraband of war, and that the Italian Council of Ministers had decided to induce Spain to revoke its decision.   On April 27–28, it was stated that an Italian deputy had asked the Minister of Foreign Affairs in Parliament whether sulphur had been excluded from the list of contraband of war.   On April 29–30, it was stated that the Spanish Government had not yet pronounced itself upon the Italian demand to exclude sulphur from the list of contraband of war; that the Italian Ambassador had been promised an immediate decision; that the Spanish Minister of Marine seemed decidedly adverse to the demand; but that it was hoped it would be conceded.   The paper of May 1–2 contained, under date of May 1, from an anonymous correspondent at Rome, these statements: "Although the official advice has not yet arrived, I assure you absolutely that the Spanish government has determined to exclude sulphur from the list of contraband of war. The Popolo Romano, confirming my information, says that the relative decree is imminent which has been provoked by the insistence of our ambassador in Madrid, who obtained from Sagasta that he should unite the Council of Ministers, in which, notwithstanding the opposition of the Minister of Marine, the opinion prevailed to exclude sulphur from contraband."   "The Official Gazette will publish the decision regarding sulphur. Meantime the Spanish Government has already ordered the commanders of its ships to allow sulphur to pass free."   The paper of May 3–4 contained, under date of May 3, from its Roman correspondent, this statement: "The Department of Foreign Affairs decided not to publish in the Official Gazette the Spanish Government's decision regarding the exclusion of sulphur from contraband of war.   But the Minister of the Interior sent a circular to all the prefects in Sicily, informing them of the orders relative to the free navigation of cargoes of sulphur."

The Giornale di Sicilia of May 5–6, 1898, contained, under

the heading "Sulphur is not War Contraband," the following:
"From the Minister of Agriculture, Industry and Commerce,
the following telegram has been sent: 'Chamber of Commerce,
Palermo: I inform the Chamber of Commerce, for the useful
information of merchants, that by the decree of April 23d of
the Spanish Government are considered, as contraband of war,
arms, projectiles, fuses, powder, sulphur, nitre, dynamite, explo-
sives, uniforms, ornaments, saddles, engines for ships, derricks,
screws, boilers, and all that is necessary for the construction,
repair and armament of men of war. I would also state that,
in consequence of our request, the Spanish Government has
given notice to the commanders of its vessels to let sulphur pass
free. The Minister, Coeco Ortu.'"

The master also testified that on the evening of May 7 he
saw a notice from the Austrian consul, saying that there had
been a communication from the prefect that it was agreed be-
tween Spain and Italy that the Spanish ships had instructions
to let sulphur go free; but "it was not given officially, only a
matter of verbal arrangement. Of course, the verbal arrange-
ment you can't believe."

Early in the morning of May 8, the master sailed, without
the sulphur, to Palermo, and thence to Messina, took on board
at each place a cargo of fruit, and on June 3 arrived at New
York. Soon after the arrival there, these libels were filed.

The Giornale di Sicilia of May 7–8, 1898, (which did not
reach the master before he sailed from Port Empedocle,) con-
tained, under the heading "The Exportation of Sulphur may be
continued," the following: "The Prefettura also with its com-
munication confirms to us that the exportation of sulphur, not-
withstanding the Spanish-American war, may continue. Indeed,
the Spanish Government has officially declared, in the circular
to the commandants of their ships, that sulphur is not to be
considered as contraband of war. An official and public dec-
laration is lacking, but there is no doubt that sulphur will pass
freely."

On May 10, 1898, the Foreign Office in London, answering a
telegram from Burrill & Sons, wrote them: "Spanish Govern-
ment state that decree already issued cannot be altered, but that

as temporary measure Naval Departments have been ordered not to treat sulphur as contraband of war. They lay stress on the fact that the measure is temporary only."

It appeared from inquiries made by the Foreign Office in London, and by the American Embassy in Italy, in June and July, 1898, that the actual state of facts was as follows: The Spanish Minister for Foreign Affairs verbally stated to the Italian Ambassador at Madrid, on April 29, 1898, and to the British Ambassador at Madrid, on May 6, 1898, that, while the decree of April 23 could not be altered, orders would be given to the Naval Departments, as a temporary measure, not to treat sulphur as contraband of war. On May 31, 1898, the Spanish Minister, in a note to the British Ambassador at Madrid, stated that the treatment of sulphur as contraband of war would be temporarily suspended; that the orders which had been given to that effect would not be revoked without due notice; and that the eventual revocation of the orders would not, in any case, apply to vessels at sea in ignorance of it, while the necessary time would be given for the execution of pending contracts. It did not appear that Spain ever made any public announcement of the modification of her intentions in regard to the treatment of sulphur, or ever agreed to let sulphur go free permanently.

A vessel which lay alongside the Styria at Port Empedocle, loading sulphur, sailed before she did, and arrived at New York in safety on May 19. Two other vessels laden with sulphur came safely from the Sicilian port of Licata to the United States about the same time. And no sulphur ships were taken by Spain during the war.

Presently after the signing of the peace protocol between the United States and Spain on August 12, 1898, the parties to these cases stipulated in writing that the steamship company should forward the sulphur from Port Empedocle by the first available vessel to New York, and deliver it to the consignees, upon the terms and for the freight specified in the original bills of lading; that the sulphur, upon arrival, should be sold at current market rates, and the proceeds, less charges incurred, be credited on account of the damages, if any, recovered by the libellants; that, if the Styria was justified in relanding and

storing the sulphur as was done, the company should have a lien upon the sulphur for the charges against it in Sicily; and that, if it was not so justified, the sulphur should be free from any charges except freight.

Under this stipulation, the steamship company paid the expenses of storage in Sicily, and reloaded the sulphur and brought it to New York in its steamship Abazzia, sailing September 4, and arriving September 30, and there delivered it to the consignees, who paid the freight as agreed, and sold the sulphur at the current market rates. And the company filed cross libels for the charges in Sicily.

The District Court found for the libellants, holding that the discharge of the cargo was too hasty and precipitate, and not justified by the facts of the case; and entered decrees for the libellants in small amounts, and dismissed the cross libels. 93 Fed. Rep. 474; 95 Fed. Rep. 698.

Both parties appealed to the Circuit Court of Appeals, which held that the sulphur was rightly discharged, but should have been reloaded before the Styria left Port Empedocle; and entered decrees for the libellants for increased damages, and upon the cross libels for the expenses of unloading, warehousing and reloading in Sicily. 101 Fed. Rep. 728.

The cases were then brought to this court by writs of certiorari, granted on petitions of both parties. 179 U. S. 683, 685.

*Mr. J. Parker Kirlin* for petitioner. *Mr. Charles R. Hickox* was on his brief.

*Mr. E. C. Burlingham* for respondent in No. 72.

*Mr. Luther G. Reed* for respondent in No. 73.

*Mr. E. B. Hill* for respondent in No. 74. *Mr. William J. Curtis* was on his brief.

*Mr. M. H. Regenburger* for respondent in No. 75, submitted on his brief.

MR. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.

The master of a ship is the person who is entrusted with the care and management of it, and the great trust reposed in him by the owners, and the great authority which the law has vested in him, require on his part and for his own sake, no less than for the interest of his employers, the utmost fidelity and attention. Abbott on Shipping, 7th Am. ed. 167.

It was well said by the District Judge in the present case, that " though exceptions noted in the bill of lading contemplate circumstances of war, and are therefore applicable in the extraordinary circumstances that arose, still the carrier is not thereby relieved from the duty of acting with reasonable prudence for the interests of all concerned. The master, as the agent of all concerned, is still bound to a prudent regard for the interests of the cargo, and must endeavor to hold the balance evenly between ship and cargo when their interests conflict."

" All will agree that the master must act in good faith and exercise his best discretion for the benefit of all concerned." *New England Insurance Company* v. *The Sarah Ann*, 13 Pet. 400; *The Amelia*, 6 Wall. 27.

The good faith of the master and his reasonable exercise of discretion must be considered and determined in the light of the facts in each particular case. The term *discretion* implies the absence of a hard-and-fast rule. The establishment of a clearly defined rule of action would be the end of *discretion*, and yet discretion should not be a word for arbitrary will or inconsiderate action. " Discretion means a decision of what is just and proper in the circumstances." Bouvier's Law Dict. " Discretion means the liberty or power of acting without other control than one's own judgment." Webster's Dict.

Courts, in passing upon such questions, should endeavor to put themselves in the position of the actors in the transaction, and not be ready to find that the course actually pursued was blameworthy because the results were unfortunate; what those concerned have a right to demand of a master, when confronted with unexpected emergencies, is not an infallible but a deliber-

ate and considerate judgment.　Mere good faith will not excuse him, if his decision turns out to have been wrong, but the result is not always a true criterion whether a man pursued a prudent course or not.　*Holliday* v. *Kennard*, 12 Wall. 254.

Applying these principles to the facts of the present case, we have to inquire whether the conduct of the master of the Styria showed a reasonable exercise of judgment, having regard to the rights of the owners of the vessel and those of the several owners of cargo.

That the situation was a difficult one is obvious, and is shown by the fact that the learned judges of the courts below, though having the advantage of a full disclosure of the facts and of able discussion by counsel, disagreed on the critical question in the case, whether the master was right in deciding that it was his duty to reland and store the contraband goods.

As heretofore stated, the Styria was an Austrian steamship, owned by the Austro-Americana Steamship Company, and Burrill & Sons of Glasgow were her managing agents.　She sailed April 16, 1898, with some cargo, from Trieste *via* Sicilian ports for New York, and on April 21 reached Port Empedocle, Sicily, her second loading port.　Her master began at once to load on board different lots of sulphur owned by the libellants, and by April 24 it was all on board, bills of lading therefor had been signed, and the vessel cleared from the custom-house, and was ready to proceed on her voyage to Messina and Palermo for additional cargo of fruit, and thence to New York. On April 27, the master, having learned that war between Spain and the United States had broken out, and being aware that sulphur was a contraband article, began to reland the sulphur at Port Empedocle, and had it all unloaded and warehoused by May 7.　He gave notice in writing to the shippers, and to the consignees named in the bills of lading, that, " on finding risky my passage to New York with the actual sulphur cargo for facts of war," he was discharging that portion of his cargo. On the same day he gave notice in writing to the Austrian consul at Girgenti " that, by order of the representative of my owners, for facts of war," he was discharging and warehousing the sulphur from the Styria, for whom it might concern; and

also gave notice in writing, through the Austrian consul, to the director general of the customs at Girgenti, that, having loaded the sulphur on the Styria, " and sulphur being declared contraband of war, war actually existing between Spain and the United States of America, in behalf of the present laws, I deem it in the interest of all whom it might concern to discharge the whole sulphur here on receiving the necessary permit from the customs ; " and asking that duties might be remitted on re-shipment. On April 30 and May 2 the shippers of the sulphur protested against the unloading ; and on May 3 and 5, respectively, the master replied that he, " in discharging the goods, acted as was his right, and in the best interest of the goods—which is confirmed by the fact, published in the papers, and discussed in the Italian Parliament, that sulphur had been declared contraband of war by one of the belligerent powers." And at the conclusion of the unloading, on May 7, the master gave notice to the shippers that, as soon as they paid the expense incurred on their account, the sulphur would be delivered to them ; and to the consignees that the sulphur was lying in the warehouses at Port Empedocle, at the risk and expense of whom it might concern.

As both the District Court and the Circuit Court of Appeals held that, within the provisions of the bills of lading, the master had the right to decide on the course to pursue, whether to discharge the sulphur, or to refuse to sail until there was some reasonable assurance of safety, or to immediately proceed on his voyage, it is unnecessary for us to discuss the meaning of the bills of lading in that regard, but only to determine whether the decision of the master, to discharge and warehouse the goods, was a reasonable exercise of the discretion vested in him.

The learned judge of the District Court held that, while the bills of lading contemplated circumstances of war and were therefore applicable, yet that the master's right under them could not be exercised without waiting a reasonable time to see whether the danger of continuing the voyage with the sulphur might not be removed by negotiation between the Italian and Spanish governments. He thus expressed himself (93 Fed. Rep. 477) :

" The sulphur being generally regarded as contraband of war, and also within the express terms of the Spanish proclamation, a voyage through the Mediterranean, past the coast of Spain and through the Straits of Gibraltar, would presumably be peculiarly dangerous to the cargo, even though the vessel, as a neutral, might not be liable to condemnation as prize.   In case of seizure, however, the shipowner would suffer from the considerable delay incident to the seizure, though she were ultimately released.   Except, therefore, for the negotiations immediately entered on for procuring an exception of sulphur from contraband, I have no doubt that it would have been both the right and the duty of the master, for the interests of the cargo as well as of the ship, to refuse to sail with this cargo after clearing on April 24, until there was some reasonable assurance of safety.   See *The San Roman*, L. R. 3 Adm. & Eccl. 583, where there was a delay of three months.   The discharge and storage of the cargo, however, was an act necessarily involving considerable expense to the shipper or consignee ; and before imposing such an expense upon the cargo the master, in my judgment, was bound in view of the daily reports of current negotiations and the expectations of the exception of sulphur, to wait a reasonable period for satisfactory assurances in that regard. . . .   I must find, therefore, that the ship was not justified by clauses (a) and (b) of the bill of lading in discharging and storing the cargo on account of the shippers, as she did, between April 27th and May 7th ; that by the 10th of May there was reasonable assurance that it would be safe to go on with the voyage, and that this was not an unreasonable time for the ship to wait under the facts and circumstances currently known in Sicily at that time."   93 Fed. Rep. 474 ; 95 Fed. Rep. 698.

The Circuit Court of Appeals took a different view of the duty of the master to suspend his voyage and await the uncertain results of the rumored negotiations, and held that he had a right to unload the cargo of sulphur when he did.   The following quotations sufficiently show the reasoning of the court :

" It seems manifest that, upon the outbreak of war, a voyage with contraband on board to the port of one of the belligerents

might fairly be regarded as a risky piece of business. The suggestion made upon the argument that the naval power of Spain was not such as would induce a man ' of ordinary courage, judgment and experience' to hesitate to proceed, is of no weight. We may not attribute to the captain of the Styria knowledge gained after the event.; and indeed this court is not advised of any historical facts which would warrant the conclusion that it was not entirely within the power of Spain, during the first few months of the war, to arrest and search every vessel westward bound through the Straits of Gibraltar, and picking her way along by the lighthouses on the Spanish coast. . . . We do not find it necessary to discuss this branch of the case, because we find in clause (a) abundant authority for a refusal to carry forward the sulphur, while such a condition of affairs existed as that already described as being generally known to exist, when the discharge began on April 27. There is no logical difference between a restraint of princes and rulers exercised by a cruiser, with power to visit, search and seize, lying two leagues off Cape Empedocle, and that exercised by a half dozen cruisers patrolling a narrow strait through which, if the voyage be made, the vessel must pass. Under such circumstances the owner of contraband cargo, loaded as this was before war broke out, could with reason insist that it would be gross negligence on the part of the ship to bring his cargo forward. Moreover, it would certainly be unreasonable to require the ship to remain in port with the contraband cargo on board until the war should cease, a period of months, possibly years. The owners of other cargo not contraband have rights as much, if not more, entitled to consideration than those of the owners who have been unfortunate enough to ship the cargo which has produced the risk. . . . Inasmuch as the master, where the contract was made in time of peace, could properly decline to carry forward a cargo which by the subsequent breaking out of war had become contraband, we fail to see why he should not have the right to land such contraband cargo, with all proper precautions as to safekeeping, thus leaving his ship free to discharge its obligations to innocent cargo without risk or delay by reason of an actual arrest, which would be caused only by the presence

of such contraband cargo. The ship made no contract to carry contraband of war to the port of a belligerent, and should not be held to the obligations of a contract into which she has never entered. We understand that the District Court reached this same conclusion, but found the ship in fault because she did not wait a reasonable period to see if there might not be some reasonable assurance of safety, and held that ' the commencement of the discharge on the 27th was too hasty and precipitate.' This brings us to the next branch of the case.

"When two nations formally proclaim the existence of a state of war between themselves with all the solemnity observed in this instance, it would seem to be going too far to say that parties whose contracts are affected thereby should wait some indefinite time, which a court shall find reasonable, in a vague expectation that the belligerents may think better of it and make peace. A situation is quite conceivable, where delay might fairly be required. Thus the minister of one power or the other might demand his passports; or the day named in an ultimatum might pass without compliance with its requirements; or a squadron of the war vessels of one power might impress seamen from the deck of the war vessel of another power, as the Carnatic and her consorts did with the Baltimore in 1798; or the war vessel of one power encountering the war vessel of another upon the high seas might pour broadside after broadside into her, as the Leopard did with the Chesapeake in 1807—any one of which acts would seem to import the imminence if not the actual existence of war, and yet might fall short of being such authoritative evidence of a state of belligerency as would justify a master in treating any part of his cargo as being thereby made contraband. But the situation shown here was a very different one. Both nations had united in proclaiming to the whole world that they were at war, and we know of no reason why the master of any vessel of a neutral nation was bound to wait twenty-four hours, or twenty-four days or twenty-four weeks, to see if the two belligerents would not settle their differences.

"As soon as he learned that war was declared the master knew that the cargo he had taken on board at Port Empedocle was contraband. 'I knew,' says he, ' that sulphur is to make gun-

powder; everybody knows that. . . . I thought it must be contraband.' We should have some doubts as to the efficiency of a master for international commerce who did not know that sulphur was contraband of war. It certainly should be a safe assumption for the master of a neutral vessel to make that he cannot carry such cargo to the ports of one belligerent without risking its seizure by the other. And, in the absence of special circumstances, there would seem to be no necessity to wait for further assurance in that regard. In the case at bar, however, there were special circumstances which will be next considered.

"The exportation of sulphur is one of the greatest industries of the island of Sicily, and the Italian government was naturally solicitous that the trade in sulphur with the United States should not be interfered with. It now appears in the record, by reports obtained from diplomatic sources, that shortly after the proclamation of the Queen Regent negotiations were opened by the Italian government to secure a modification of its provisions so that sulphur should not be considered contraband of war. The Spanish government declined to alter the decree, but on April 29, at Madrid, the Spanish Minister of Foreign Affairs 'Verbally' [*sic:* orally ?] stated to the Italian Ambassador that orders would be given to the Naval Departments, as a temporary measure, not to treat sulphur as contraband of war. The same statement was made by the Spanish Minister for Foreign Affairs to the British Ambassador on May 6. On May 31 the same Minister stated in an official note to both the Italian and the British Ambassadors that the treatment by Spain of sulphur as contraband of war would be temporarily suspended, and that the order which had been given to that effect would not be revoked without due notice.

"Not being in telephonic communication with the chancellery of the embassy at Madrid, the master of the Styria was not advised of these transactions at the moment they occurred. And his conduct is to be judged not in the light of exact knowledge acquired after the event, but by such information as may have been available for him at the time and place. As we have seen, he knew certainly on April 27, and probably on April 26,

that war had been declared, and that his sulphur cargo was contraband; that he was, therefore, entitled to land and store it, thus leaving his ship free to carry out her obligations to the rest of the cargo. On April 25 the Giornale di Sicilia, a newspaper published at Palermo, and which the captain saw from day to day, stated that Messina merchants had asked their Parliamentary deputy to urge the government to coöperate to exclude brimstone from being considered contraband. From day to day thereafter the paper was filed with reports and rumors as to the progress of this movement to secure exemption. But down to the 6th of May not one of these reports bore the stamp of authority; no one vouched for their accuracy. The statements in the clippings from the newspaper which have been printed in the record are merely the expression of the beliefs and expectations of its correspondents in Rome, or elsewhere furnishing copy to a paper published in a community where an intense interest was felt in having sulphur exempted. There was no reason why it should be exempted; it is a variety of merchandise such as always has been contraband; its exportation to the United States might well be considered an 'aid' to Spain's enemy; no one appears to have suggested that the United States concede the same exemption. On the one hand it might be urged that it would please the government and people of Italy to grant the request, but on the other hand, in the case of merchandise so highly contraband, neither the Italian government nor people could justly take offence, if Spain should insist on exercising the rights which international law accords to every belligerent. Enlightened by the information now made known, we can see that the hopeful prognostications of the writers for the Journal of Sicily were well founded; but there was nothing to give any such assurance at the time they appeared. We should hesitate to hold that it was the duty of a master under similar circumstances to delay action on the expectation that a belligerent would voluntarily abandon one of its weapons, on no better assurance that such action would be taken than the statements of anonymous and irresponsible contributors to a newspaper published in a community which is extremely solicitous that such action be taken." 101 Fed. Rep. 728.

We concur in these views of the Circuit Court of Appeals and in the conclusion thereby reached, that the master of the Styria was justified in relanding and warehousing the contraband portion of his cargo, and that in so doing he had reasonable regard for the interests of both ship and cargo.

Several leading authorities are cited on this branch of the case in the brief for the Styria, and which we shall briefly notice.

*Geipel* v. *Smith*, L. R. 7 Q. B. 404, was a case where the defendants had agreed to load a cargo of coal in England and sail to Hamburg. After the charter party had been made war broke out between France and Germany, and the port of Hamburg was blockaded by the French fleet. The defendants refused to carry out the charter party, relying on an exception of restraints of princes and rulers. It was held that they were justified in their refusal. And as to the contention that the defendants were bound to be in readiness to carry the cargo as soon as the blockade should be raised, Cockburn, C. J., observed:

" But it would be monstrous to say that in such case the parties must wait, for the obligation must be mutual, till the restraint be taken off—the shipper with cargo which might be perishable or its market value destroyed—the shipowner with his ship lying idle, possibly rotting;" and Lush, J., said: " A state of war must be presumed to be likely to continue so long and so to disturb the commerce of merchants as to defeat and destroy the object of commercial adventure like this."

In *Nobel's Explosives Co.* v. *Jenkins*, L. R. 1896, 2 Q. B. 326, the plaintiff's goods, which were dynamite and contraband of war, had been placed upon a general ship of the defendant for carriage from London to Yokohama, a bill of lading containing similar clauses with those in the case of the Styria. The ship also contained non-contraband goods belonging to other shippers. In the course of the voyage she arrived at Hong Kong, and while there war was declared between China and Japan. There were at the time Chinese war vessels in and around the port of Hong Kong, and it was found that if the master had attempted to sail thence with the plaintiff's goods on board there would have been danger of their being seized and confiscated. The master

cabled to his owners for advice, and they instructed him to land the cargo at Hong Kong. This was done, The plaintiffs forwarded the dynamite by another steamer several months later, and then brought an action to recover from the defendants the amount of freight which they had to pay for so forwarding, and also for the other expenses for relanding and reshipping the cargo at Hong Kong. The opinion of the court, delivered by Matthew, J., is so pertinent to our case that we extract a considerable portion of it:

" The main ground of defence was the exception in the bill of lading of ' restraint of princes, rulers or people.' A large body of evidence was laid before me to show that if the vessel sailed with the goods on board she would, in all probability, be stopped and searched. It was certain in that case that the goods would have been confiscated, and quite uncertain what course the captors would take with the ship and the rest of the cargo. I am satisfied that if the master had continued the voyage with the goods on board he would have been acting recklessly. It was argued for the plaintiffs that the clause did not apply unless there was a direct and specific action upon the goods by sovereign authority. It was said that the fear of seizure, however well founded, was not a restraint, and that something in the nature of a seizure was necessary. But this argument is disposed of by the cases of *Geipel* v. *Smith*, L. R. 7 Q. B. 404, and *Rodoconachi* v. *Elliott*, L. R. 9 C. P. 518. The goods were as effectually stopped at Hong Kong as if there had been an express order from the Chinese government that contraband of war should be landed. The analogy of a restraint by a blockade or embargo seems to me sufficiently close. The warships of the Chinese government were in such a position as to render the sailing of the steamer with contraband of war on board a matter of great danger, though she might have got away safely. The restraint was not temporary, as was contended by the plaintiffs' counsel. There was no reason to expect that the obstacle in the way of the vessel could be removed in any reasonable time. I find that the captain in refusing to carry the goods farther acted reasonably and prudently, and that the delivery of the goods at Yokohama was prevented by restraint of princes and rulers within the meaning of the exception. . . .

Opinion of the Court.

" But, apart from the terms of the bill of lading, it seems to me that the conduct of the captain would be justified by reference to the duty imposed upon him to take reasonable care of the goods entrusted to him. Whether he has discharged that duty must depend on the circumstances of each case, and here, if the goods had been carried forward, there was every reason to believe that the ship would be detained and the goods of the plaintiffs confiscated. In the words of Willes, J., in *Notara* v. *Henderson*, L. R. 7 Q. B. 225, at p. 234, ' a fair allowance ought to be made for the difficulty in which the master may be involved. . . . ' The place, the season—the opportunity and means at hand, the interests of other persons concerned in the adventure and whom it might be unfair to delay for the sake of the part of the cargo in peril; in short, all circumstances affecting risk, trouble, delay and inconvenience must be taken into account. I am of opinion that the course taken by the captain in landing the goods and landing them in safe custody was a proper discharge of his duty. It was said that the master was not an agent for the shippers, because they had protested against the discharge of the goods. But even if this information had reached the captain, it would not have divested him of his original authority and discretion as agent in any emergency for the owners of the ship and the other owners of the cargo."

A suggestion of the District Judge, and repeated in the argument for the libellants, to the effect that the master was guided in his action in discharging the contraband cargo by a telegram from Burrill & Sons, the managing agents in London, rather than by his own judgment on all the circumstances known to him at the time; that if he had been left to exercise his own judgment, he would not have discharged the cargo, especially not at the time he did, does not appear to us to be supported by the testimony of the captain, which is the only evidence on the subject. It is true that he did state that he acted under instructions of the agents, but he also said, in reply to questions put on cross-examination, as follows:

" Now, Captain, you say that you put this brimstone ashore on instructions of the managing owners? Answer. Yes, and also because I knew that the war was there, and I acted on the

bill of lading clause. Question. You have testified, haven't you, that all this you did by orders? Answer. No. The principal reason was because I was ordered; and, secondly, that I had the bill of lading clause that fully authorized me when I deemed it not safe to proceed with the cargo that was declared contraband of war."

Without transcribing all of the master's testimony, but having read and weighed it, we are of opinion that it clearly shows that, while he carried out the instructions of the agents, his judgment, on the facts confronting him, was that it was not safe for him to proceed with a contraband cargo, nor proper to await indefinitely for the uncertain results pending negotiations between Italy and Spain. His conduct, as we have already said, had due regard to the interests of all concerned in the ship and in the cargo, both that which was contraband and that which was not so. So far as the shipowners were concerned, he had the approval of the managing agents; so far as the shippers and consignees were concerned, he acted upon his own judgment, exercised, apparently in good faith, on their behalf. In the case of *Nobel's Explosives Co.* v. *Jenkins*, just cited, the same facts appeared, namely, that the master consulted the owners of the ship before he acted, but also acted in reference to the duty imposed upon him to take reasonable care of the goods entrusted to him. The master, in either case, would have acted imprudently if he had not secured the approval of the shipowners, if it were possible to get it before the emergency was over; and all that can be said is, that there was a concurrence of judgment between the ship agents and the master as to what was the proper course to pursue.

But, while we concur with the conclusion of the Circuit Court of Appeals, that the master acted discreetly in landing and storing the contraband portion of the cargo when and as he did, we cannot accept the other conclusion of that court that, in the subsequent circumstances, it was the master's duty to reship the cargo and resume his voyage with the sulphur on board. Indeed, the facts and reasoning which brought the court to its first, seem to us to be quite inconsistent with its latter conclusion. In its opinion, heretofore quoted, the court said that it

was.not the duty of the master " to delay action on the expectation that a belligerent would voluntarily abandon one of its weapons on no better assurance that such action would be taken, than the statements of anonymous and irresponsible contributors to a newspaper published in a community which is extremely solicitous that action be taken." Yet the court thought that, on May 6, the situation had changed, and that the publication in a newspaper, purporting to be from the Italian Minister of Agriculture, Industry and Commerce, that the Spanish Government had given notice to the commanders of its vessels to let sulphur pass free, was an official declaration, upon the strength of which the master ought to have reshipped the sulphur. That publication, under the date of May 5 and 6, was as follows: " Chamber of Commerce, Palermo: I inform the Chamber of Commerce, for the useful information of merchants, that by the decree of April 23 of the Spanish Government, are considered as contraband of war, arms, projectiles, fuses, powder, sulphur. . . . I would also state that, in consequence of our request, the Spanish Government has given notice to the commanders of its vessels to let sulphur go free."

The publication of May 7 and 8 was as follows: " The prefettura, also, with its communication confirms to us that the exportation of sulphur, notwithstanding the Spanish-American war, may continue. Indeed, the Spanish Government has officially declared in the circular to the commandants of their ships, that sulphur is not to be considered as contraband of war. An official and public declaration is lacking, but there is no doubt that sulphur will pass freely."

It must be observed that these assurances did not come from any Spanish, but from Italian sources. It was for the interest of the Italians to continue to export sulphur, and to give the impression that it could be done with security to the carrying vessels, and all statements from Italian sources must be weighed with reference to that fact. In the meantime, on May 7, the Styria had sailed, and the master testified that when he was clearing the ship to leave on the 7th of May he saw a notice from the consul to say that there was a communication from the prefect that it was agreed between Italy and Spain that

sulphur would not be taken, that Spanish vessels had instructions to let it go free, saying: "It was not given officially—only a matter of verbal arrangement. Of course, the verbal arrangement you cannot believe." "On the 7th, in the evening, about eight o'clock, and I already had my clearances." And he further testified, in reply to a question by libellant's counsel, as follows: "Question. But the day before you sailed, on the 7th, you did read in the papers that the Governments had come to an agreement—to an understanding? Answer. Yes—not to an understanding, not to a safe understanding, but a temporary understanding, you know. Question. To the effect that sulphur temporarily would not be treated as contraband of war? Answer. Yes. Question. In spite of the previous proclamation, was it not? Answer. Yes, but the papers said, not officially confirmed, you see. That meant, of course, they could withdraw it at any moment. Question. The newpapers in which you read about these things, were what papers? Answer. I could not tell you. I believe the Sicilian Courier; I don't know; something like that; the paper published in Palermo—the largest paper published in Palermo."

From this it appears that when the Styria sailed on the evening of May 7, the only information that the captain had was that the newspapers said that a temporary verbal arrangement had been made between Italy and Spain that sulphur might go free, but that the captain's opinion was that a mere verbal arrangement could not be relied on, and that the statements contained in the newspapers could be withdrawn at any moment.

Giving to the evidence every reasonable intendment, it falls far short, in our opinion, of making it the master's duty to change his arrangements to sail on the evening of the 7th of May. The Spanish proclamation of April 23, declaring sulphur to be contraband, had not been withdrawn, and it is evident that the master had no right, in justice to the other cargo owners, to make a longer delay. A perishable cargo of fruit was awaiting the vessel at Palermo, and no one could foretell what the result of the negotiations would be. The master and the ship cannot reasonably be charged with knowledge of subsequent events. And when they are examined they do not show

that, within a reasonable period, any change in affairs was disclosed that would have made it safe beyond question to have sailed with the contraband cargo on board.   It was not until May 10 that the British Government, replying to Burrill & Sons' previous application for information, telegraphed that orders had been given not to treat sulphur for the present as contraband of war.   And by telegram of that date it was further stated that the Spanish Government states that " decree already issued cannot be altered," but that, as " temporary measure," naval departments have been ordered not to treat sulphur as contraband of war, " but they lay stress on the fact that the measure is temporary only."

Moreover, it does not appear when such orders were actually given, nor that they had been transmitted to war vessels which had sailed, under the directions of the proclamation of April 23, before such alleged orders were given.   It was not until May 31 that the Spanish Minister stated, in a note to the English Ambassador at Madrid, that the treatment by Spain of sulphur as contraband of war would be temporarily suspended, and that the order which had been given to that effect would not be revoked without due notice.   It does not appear that any formal agreement was ever made between Spain and Italy, or any other Government, that the proclamation of April 23, declaring sulphur contraband of war, was withdrawn.   And it is mere matter of conjecture whether, if the Styria had sailed, even as late as May 10, with sulphur on board, and had been arrested by a Spanish war vessel which had not received orders countermanding the proclamation, that the sulphur would not have been confiscated by a Spanish prize court.   In any event, there was the liability of such an arrest and of the incident delay to both vessel and cargo.

Without protracting the discussion, we are of the opinion that the master was justified in landing and storing the cargo that had become contraband by reason of the outbreak of the war between Spain and the United States, and by the Spanish proclamation of April 23 ; that, having acted reasonably with due regard to the interest of all concerned in so doing, it was not made his duty, by the facts brought to his notice, to reship the sulphur on the Styria and further delay his voyage.

The sulphur was subsequently, in pursuance of an agreement in writing, after the signing of the peace protocol between the United States and Spain, forwarded on the steamship Abazzia, belonging to the owners of the Styria, to the port of New York. Several questions arose in the courts below, under the terms of that agreement, and chiefly having reference to the measure of damages in case that the vessel was held liable. But as, for the reasons given, we hold that the vessel was not liable, those questions do not call for our consideration.

*The decrees of the District Court and of the Circuit Court of Appeals, sustaining the libels of the respective libellants, are hereby reversed; the decrees of the Circuit Court of Appeals reversing the decrees of the District Court, dismissing the respective cross libels, are hereby affirmed, and the causes are remanded to the District Court with directions to take further proceedings in conformity with the opinion of this court.*