**Complaint of Singapore Navigation Company, S. A., as owner of the STEAMSHIP SINGAPORE TRADER, and China Marine Investment Co., Ltd. and China Overseas Navigation Co., Ltd., Plaintiffs, for exoneration from or limitation of liability.**

**SINGAPORE NAVIGATION COMPANY, S. A., et al., Plaintiffs-Appellants,**

v.

**MEGO CORP. et al., Cargo Claimants-Appellees.**

**No. 368, Docket 75–7380.**

United States Court of Appeals, Second Circuit.

Argued Jan. 22, 1976.

Decided July 15, 1976.

Lawrence J. Bowles, New York City (Kirlin, Campbell & Keating, David W. Martowski, New York City, of counsel), for plaintiffs-appellants.

David L. Maloof, New York City (Donovan, Donovan, Maloof & Walsh, Charles C. Goodenough, New York City, of counsel), and Raymond P. Hayden, New York City (Hill, Rivkins, Carey, Loesberg & O'Brien, Robert J. Ryniker, New York City, of counsel), for Cargo claimants-appellees.

Before MOORE, OAKES and MESKILL, Circuit Judges.

MOORE, Circuit Judge:

In early October, 1971, Singapore Navigation Company, S.A., (the shipowner), owner of the steamship SINGAPORE TRADER (TRADER), was faced with a problem and a difficult decision. TRADER had sailed from Hong Kong on August 22, 1971, bound for New York, laden with a cargo of 74,641 paper cartons, consisting primarily of Christmas goods destined for the 1971 Christmas market in New York. This cargo was covered by 472 bills of lading. At the time of sailing, there was a possibility that a strike on the West Coast by the International Longshoremen's Association (ILA) might spread to the East. In anticipation of this contingency, a handstamp was superimposed on the front of each bill reading as follows:

"ALL U.S.A. CARGO WILL BE DISCHARGED AT THE NEAREST NON–U.S. PORT(s) IN EVENT OF THE LONGSHOREMEN STRIKE AT THE U.S. EAST COAST CONTINUES AND CARGO FROM SUCH DISCHARGING PORT(s) TO BILL OF LADING DESTINATIONS ARE AT THE COST AND RISK OF CARGO."

The TRADER arrived in New York (actually at a pier in Brooklyn) and commenced unloading its cargo on September 28, 1971. When only some 15–20% of the cargo had been unloaded, a strike possibility materialized and forced a cessation of work at midnight on September 30, 1971. At this point, the Shipowner had to look to the bills of lading which covered the cargo for its contract obligations. The handstamp read "All U.S.A. cargo will be discharged at the nearest non-U.S. port(s)" in event of a strike; the bill of lading (clause 5) in its printed form, read, in substance, that if discharge were impeded by a strike "the carrier and/or his agents and/or the master may (if in his or their uncontrolled discretion he or they think it advisable) at any time" alter or depart from the agreed route. Query: did the handstamp supplant clause "5"; did it merely give the Shipowner additional rights, namely to proceed to non-U.S. ports; and was it mandatory or discretionary?

The nearest non-U.S. ports were Canadian. The Shipowner's agent Gannet Freighting Inc. of New York, which with the assistance of Colley Motorships Ltd. of Montreal, had canvassed the Canadian situation, advised the Shipowner that the ports of St. John, Halifax, Quebec and Montreal were ILA controlled and hence, would be unavailable for the discharge of cargo from a runaway ship[1] such as the TRADER. As a consequence, Gannet advised the Shipowner to proceed to Detroit, a non-ILA port, where adequate facilities existed for the immediate discharge and delivery of the cargo and where it had made appropriate arrangements for the TRADER. Gannet gave this recommendation on October 6, 1971, the Shipowner confirmed the Detroit arrangement on October 7, 1971, and the TRADER left New York for Detroit on October 8, 1971. Arrival after a stop in Montreal was estimated to be October 16, 1971.

All would have gone well, and the Christmas trees and decorations would have

---

1. A runaway ship may be defined as a ship which has left a strike-bound port in an effort to find a port where it may discharge its cargo.

appeared in countless homes in the New York area at that festive season, but for the grounding of the TRADER in the early morning of October 15, 1971, while proceeding through the St. Lawrence Seaway en route to Detroit on a shoal outside of the channel and in the vicinity of Clayton, New York. The court's finding of negligent navigation is clearly supported by the evidence.

The other issues before the Court arise out of the claim of the cargo owners that in proceeding towards Detroit, the TRADER was guilty of an unreasonable deviation. Resolution of this question calls for answers to two questions: (1) was there a deviation and (2) if so, was it unreasonable?

(1) The voyage contemplated was from Hong Kong to New York, where the cargo normally would be discharged. However, the parties themselves provided for the contingency of a strike. If there were a strike, the printed clause 5 on the back of the bill gave the Owner and Master broad discretion to "abandon" or "suspend the voyage" or to depart from the customary route. Were there no other provisions our review would focus upon the exercise of that discretion. However, the parties endeavored to cover the strike contingency by creating a special clause superimposed on the bill by the handstamp. Even this clause presents a problem. Does "will" mean "must", as claimants argue, or is it merely permissive and but an extension to non-U.S. ports of the discretion given in clause 5, as the Shipowner argues. If "non-U.S. port[s]" was not mandatory, Detroit, ready, able and willing to receive the TRADER, should have been a satisfactory solution. In fact, the Court recognized that "discharge at Detroit fulfilled the ordinary condition of a bill of lading 'liberties clause' in that it was indeed among the best available safe and convenient ports.

(2) Was the deviation unreasonable? Obviously, some deviation was necessary if the cargo were to be unloaded. "Nearest Non-U.S. port[s]" could only mean Canada. The trial concentrated almost entirely on where in Canada the TRADER could *not* have discharged its cargo. Knowledgable witnesses concurred that the ILA strike would have affected normally available ports such as Saint John, Halifax, Quebec and Montreal,[2] and that cargo could not have been discharged there. With this conclusion the trial court agreed and its findings are based upon adequate proof.

Towards the end of the trial and after four witnesses had testified and pre-trial testimony of five witnesses had been read, the testimony of the manager of Valleyfield Dock & Terminal Co., Ltd. was read. Valleyfield is a small Canadian non-ILA port a short distance from Montreal. It had the physical facilities to accommodate the TRADER, two sheds were available, one empty, the other substantially empty. Two general cargo ships could be handled. The labor force was adequate. Fifteen truck lines and two rail lines served the port.

However, Valleyfield was practically a forgotten port (at least by the parties here) until elevated out of its obscurity by the cargo claimants "motivated by retrospective vision and the infelicitous fact of stranding in asserting their rights to object to the deviation as unreasonable." (App. p. 117a) However, "hindsight," the progenitor of countless lawsuits, should not militate against the claimants if their legal rights are clear.

Their position is succinctly stated in their brief:

"Valleyfield being perfectly suitable, and the contract of carriage, by a specific mandatory stamp on its face calling for discharge there, the appellants' failure to do so and thus to expose the cargo to the dangers of further river transit was a deviation."

The Trial Court too, was influenced by the fact that "[t]he risk of carriage for the additional distance to Detroit was substantial"; that "the voyage is lengthy and diffi-

---

**2.** Under some circumstances not here present, some witnesses thought that some of these ports might have been available.

cult inland passage through narrow channels possessing many obstructions and special risks"; that a local compulsory pilot was required and that these perils were beyond those contracted for in the bills of lading. These considerations led the Court to the conclusion that:

> "Under the circumstances, failure to discharge at Valleyfield, as the nearest non-U.S. port was an unjustified breach of the contract of carriage and an unreasonable deviation, rendering the vessel and her owner liable for the accident which occurred after having passed that port." (App. p. 123a)

There is no doubt that Valleyfield was three days nearer than Detroit and that the TRADER's cargo could have been discharged there although as the Court said "its facilities were less efficient than Detroit". But apparently Valleyfield as a possibility never entered the minds of the Shipowner or its agents—at least as a feasible port for cargo discharge. Thus, if fault there be, attributable to the Shipowner or its agents, it would be that no effective investigation of Valleyfield's possibilities was made. If such were made, it is not revealed in the record. The agents assured themselves of the unavailability of the many ILA ports; probably Valleyfield was passed over as having inadequate facilities. The rest is interesting speculation. If the TRADER had turned in at Valleyfield, it would not have had to traverse the Seaway. If the pilot had not momentarily retired to make some financial instead of navigational calculations the TRADER might not have gone off course.

■ But some decision must be made. The loss of the cargo was not due to an act of God or a peril of the sea, but rather to a human error of navigation and the question of liability must be resolved from the contractual obligations which the parties imposed upon themselves.

■ The balancing scale swings almost evenly but the parties, endeavoring to cope with the possible emergency, did say, in effect, "Go to Canada". This was their bargain. Had they said "Go to any port available for unloading" different consequences might have ensued—but they did not so write. A rather well settled principle of law is that the overriding stamp is to be considered as superceding the printed form if there be conflict. *Capitol Bus Co. v. Blue Bird Coach Lines, Inc.,* 478 F.2d 556 (3rd Cir. 1973); *Western Oil Fields Inc. v. Pennzoil United, Inc.,* 421 F.2d 387 (5th Cir. 1970).

■ Therefore, the requirement that the cargo "will be discharged at the nearest non-U.S. port[s]" did place a burden upon the Shipowner to fulfill this obligation if possible. The record indicates that cargo discharge was proceeding at Valleyfield. Only the "MINNIE LOTUS" and the "DAGRUN" were ahead of the TRADER. The "MINNIE LOTUS" apparently sailed and the "DAGRUN" was only in two days. Even if such a time schedule were not achievable, unloading of the TRADER could probably have been commenced at Valleyfield at the latest shortly after the TRADER would have arrived in Detroit and the Shipowner would have fulfilled its commitment.

■ The Trial Court found the handstamp overrode and superceded the printed clauses of the bill of lading (Finding 4); that Valleyfield was available for cargo discharge (Finding 9); and that Mr. Lin's [plaintiff's President] failure to order the vessel to discharge at Valleyfield was an unreasonable deviation (Finding 12).[3] With these findings we agree.

■ The Shipowner's argument that the claimants waived the deviation is not supportable in law or in fact. The decision to

---

**3.** We do not agree with the Trial Court that the ordering of the TRADER to Detroit was at least in part for the economic convenience of the Shipowner (Finding 11) or in the opinion that the risk of carriage to Detroit was substantial, that there were many obstructions and special risks in the Seaway passage or that the necessity of a compulsory pilot subjected the TRADER to additional perils. However, these findings are not material to our interpretation of the contractual obligation of the bills of lading.

direct the TRADER to sail for Detroit was made without claimants' knowledge, their consent was neither sought nor given. Whether the notices were addressed to the consignees or merely their agents is immaterial. The notice at best was merely an announcement that the TRADER had sailed for Detroit. There was nothing the consignee could have done to change its course or destination. The essential elements of knowing waiver are lacking.

There remains for consideration only the relation of the Court's findings and conclusions to the suit before us as presented by the pleadings. As the result of two suits filed against the Shipowner arising out of the grounding of the TRADER and the cargo damage, the Shipowner filed this suit for exoneration from, or the right to limitation of, liability and requiring all claimants to present their claims. Many claims were presented. This suit therefore deals with the respective rights of the Shipowner and the claimants.

The Trial Court having held the deviation unreasonable denied the petition for exoneration from the limitation of liability and gave judgment in favor of the cargo claimants, the amount thereof to be determined in a separate trial to be held after appellate finality of the interlocutory judgment entered herein.

■ The unreasonable deviation precludes Shipowner's counterclaims for general average contribution. *World Wide S. S. Co. v. India Supply Mission,* 316 F.Supp. 190 (SDNY 1970) at 193–94, and for freight charges.

■ The only remaining issue is whether the Shipowner's liability can be limited pursuant to 46 U.S.C. § 183. This statute states:

"The liability of the owner of any vessel . . . for any . . . loss, or destruction by any person of any property . . . shipped or put on board of such vessel, or for any loss, damage, . . . .

or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not . . . exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

The key requirement of the statute is that the damaging act occur "without the privity or knowledge of such owner." *Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 205, 88 S.Ct. 379, 388, 19 L.Ed.2d 407 (1967). But here Shipowner's president, Mr. Lin, personally ordered the deviation and the deviation was causally connected to the loss.

For the reasons heretofore stated, that judgment is affirmed.

OAKES, Circuit Judge (dissenting):

This case, of little or no significance except to the parties, is as Judge Moore implies somewhat Tweedledum and Tweedledee. I believe, however, that it is also another case[1] where the courts sitting in admiralty look too much to form and too little to economic substance. I agree with appellants that the real purpose, in the light of which the bill of lading should be interpreted, of all parties in the event of an East Coast strike was to have the cargo of Christmas goods discharged at the best alternate point, within or without the United States, to achieve the commercial aim of the transaction, viz., to enable the Christmas goods after discharge to reach the 1971 New York market. If Boston or Portland had somehow been open, to go to either would not have been a deviation. "Non-U.S. port[s]" in the special clause was then not mandatory, but permissive, and Detroit so far as the Seaway was concerned was "indeed among the best available safe and convenient ports," as the district court found, thus fulfilling the ordinary requirement of the "liberties" clause. Thus I would hold no deviation.

1. *See e. g., Fitzgerald v. Texaco, Inc.,* 521 F.2d 448 (2d Cir. 1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976).

| Call number | | Room no. | Date due | |
|---|---|---|---|---|
| | | | | |
| | | Vol. | No./Pt. | Year |
| | | | | |
| | | Ed. | Copy | Initials K H |

Author

Title

Do not write in this space

Student ☐   Officer ☐   Staff ☐

| Signature | Today's date |
|---|---|
| Address | |
| City | Telephone |

**Harvard Law School Library**

 

The district court also found that the shipowner "relied on [his agent] Gannet in instructing the Master to proceed to Detroit," that "Gannet made good faith efforts . . . to ascertain conditions in Canada," and that Gannet "acted reasonably in reporting to its principal." Gannet did report to the owner that "[i]nsofar as Canadian ports are concerned our agents have advised again that any suitable Canadian port such as St. John, Halifax, Montreal will not accept the vessel a/c union problems." (The district court viewing the case after the fact agreed with that advice.) The report then went on to say: "Other smaller Canadian ports who don't have union problems are hopelessly inadequate in warehouse space, transit facilities, etc." In retrospect it turns out, or so the district court found, that discharge could apparently have been effected at Valleyfield. But the shipowner or its agent did not learn this after "good faith efforts" and "reasonable" reporting.

It strikes me that the rule of *The Styria v. Morgan,* 186 U.S. 1, 9, 10, 13, 15, 22, 22 S.Ct. 731, 46 L.Ed. 1027 (1902) (discharge in Sicily of American cargo, sulfur, contraband on Spanish enemy's list, not unreasonable despite Spain's later temporarily exempting sulfur from list), should prevail: a master's "conduct is to be judged, not in the light of exact knowledge acquired after the event, but by such information as may have been available for him at the time and place." *Id.* at 15, 22 S.Ct. at 737 (quoting from the Circuit Court of Appeals). *See also The Wildwood,* 133 F.2d 765, 767–68 (9th Cir. 1943) (mid-Pacific abandonment of voyage to Russia in early 1940 not unreasonable). No one knew of the availability or adequacy of Valleyfield. In the light of the knowledge and information available to the owner here, in reasonable reliance on his agent's good faith efforts, I fail to see how any deviation by discharging at Detroit was unreasonable. Reasonableness means deliberated, considered, rational judgment, not infallibility or prescience.

The result of the decision is to make the carrier or his insurer wholly liable for the cargo loss, despite COGSA, 46 U.S.C. §§ 1304(2)(a), (j), without general average contribution or freight, or alternatively limitation of liability under 46 U.S.C. § 183 *et seq.* This seems to me harsh where the underlying reason for the old rule of deviation was that the cargo lost its insurance when the vessel deviated, *see* G. Gilmore & C. Black, The Law of Admiralty 181–82 (2d ed. 1975), and at present cargo policies usually cover, at least until the cargo owner learns of a deviation. *Id.*

I accordingly would reverse.