·THE KRONPRINZESSIN CECILIE.

(Circuit Court of Appeals, First Circuit. November 17, 1916. On Petitions for Rehearing, January 23, 1917.)

Nos. 1196–1199.

1. SHIPPING ⬳115—AUTHORITY AND DUTIES OF MASTER—NONDELIVERY OF SHIPMENT.

On July 28, 1914, a German steamship sailed from New York for Bremerhaven, Germany, via Plymouth, England, and Cherbourg, France. On the evening of July 31st, when about 1000 miles from Plymouth, it changed its course and returned to an American port. The master had knowledge of such historical facts, conceded to have preceded the outbreak of the European war, as occurred before the sailing of the vessel, and of facts thereafter occurring indicating that his country was on the verge of war with Russia, France, and England, and just before changing his course received a wireless message from the steamship company, the owners of the vessel, stating that war had broken out between the above-mentioned countries and directing him to return to New York. War had not, in fact, been declared at that time. *Held* that, while the master is bound to exercise his discretion for the safety of his ship, passengers, and cargo, the act of the master in turning his vessel back to New York on receipt of the message of the owners cannot be treated as an exercise of the master's discretion, the direction being peremptory, and the statement that war had broken out ,being false; this being particularly true as the master might, in the ordinary course of events, have discharged cargo consigned to Plymouth and Cherbourg, and have reached a point of comparative safety near his home waters, before war was actually declared between Germany, France, and England.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 433; Dec. Dig. ⬳115.]

2. SHIPPING ⬳115—FAILURE TO DELIVER CARGO—OUTBREAK OF WAR.

The vessel had accepted shipments of specie destined to Plymouth and Cherbourg under contracts exonerating the owner for loss or damage occasioned by arrest and restraint of princes, rulers, or people. The contract of shipment was made at a time when the imminence of war was known to the master and the owners, and the specie might have been delivered at Plymouth and Cherbourg 11 hours before Germany was at war with France and more than 24 hours before Germany was at war with England. *Held* that, as the arrest or restraint to excuse compliance with the contract must be an actual and operative restraint and not a merely expected and contingent restraint, the vessel is liable for nonperformance of the contracts of shipment; the expectation of war not

amounting to an actual state of war whereby, under the law of the flag of the vessel, it would be improper to make delivery at a port where it might be captured or detained.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 433; Dec. Dig. ☞115.]

3. SHIPPING ☞115—NONDELIVERY OF SHIPMENT—OUTBREAK OF WAR.

In such case, the act of the owners in abandoning the voyage cannot be justified on the ground that it is the carrier's duty to take reasonable care of the goods intrusted to him, for the precautions were obviously for the sake of the vessel, and not the cargo, and were intended to place the vessel at a point of safety, should hostilities actually be commenced.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 226, 433; Dec. Dig. ☞115.]

4. SHIPPING ☞163—PASSENGERS—NOTICE.

Where tickets for passage provided that no claim should be enforceable against the shipowner, or its property, unless notice thereof in writing should be delivered to the shipowner or agent within 5 days after termination of the voyage, or in case of the voyage being abandoned or broken up within 10 days thereafter, passengers on a German vessel, which wrongfully abandoned a voyage on account of the imminence of war between Germany, France, and England, cannot claim damages for breach of contract, where no claim was presented within the 10 days provided.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 530–532; Dec. Dig. ☞163.]

Putnam, Circuit Judge, dissenting.

### On Petitions for Rehearing.

5. SHIPPING ☞163—PASSENGERS—VIOLATION OF CONTRACT.

In such case, if the express contracts of passage were displaced by the deviation of the libeled vessel, passengers, not being injured in their person or property, would have no ground of action, aside from the breach of the express contract.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 530–532; Dec. Dig. ☞163.]

6. SHIPPING ☞163—DEVIATION—INSURERS.

Where a steamship abandoned a prescribed voyage, passengers suffering no injury to person or property could not recover for the deviation on the theory that the steamship company became an insurer; that rule not applying to passengers, save in the absence of the express contract.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 530–532; Dec. Dig. ☞163.]

Appeals from the District Court of the United States for the District of Massachusetts; Clarence Hale, Judge.

Libel by the Guaranty Trust Company of New York against the steamship Kronprinzessin Cecilie, claimed by the North German Lloyd, together with libels by Charles W. Rantoul, Jr., by Maurice Hanssens, and by the National City Bank of New York against the same vessel. From a decree dismissing the libels (228 Fed. 946), libelants appeal. Reversed as to the libel by the Guaranty Trust Comany of New York and National City Bank of New York, and affirmed as to the libels of Charles W. Rantoul, Jr., and Maurice Hanssens.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

J. Parker Kirlin, Charles R. Hickox, and James M. Beck, all of New York City (Kirlin, Woolsey & Hickox and Shearman & Sterling, all of New York City, Blodgett, Jones, Burnham & Bingham, of Boston, Mass., Carl A. Mead and John M. Woolsey, both of New York City and Edward E. Blodgett, of Boston, Mass., on the briefs), for appellants.

Joseph Larocque and Walter C. Noyes, both of New York City (Joseph D. Bedle, of Jersey City, N. J., and Choate, Larocque & Mitchell, of New York City, on the brief), for appellees.

Before PUTNAM, DODGE, and BINGHAM, Circuit Judges.

DODGE, Circuit Judge. The careful and detailed statement of the material facts involved in these cases which is found in the opinion of the District Court (228 Fed. 946) will render direct reference unnecessary to the evidence in the record, except in a few instances. As to the facts there is little or no controversy.

[1] 1. From Bremen, the home port of this German steamship and her ultimate port of destination on the voyage here in question, her owner, a German corporation, sent a wireless message to her master on July 31, 1914, at 2:45 p. m. This message he received on board the ship, at sea, at 10 p. m., on the same day, by the ship's time—11:45 p. m. by Greenwich time. The message consisted of the peremptory order, "Turn back to New York," prefaced by the statement, "War has broken out with England, France, Russia." This statement meant, as is not disputed, and it was understood by the master to mean, that war had actually broken out between Germany and each of the other countries named. Neither at the time it was sent nor at the time it was received was the statement true as to either of said countries. Not only had no war been declared between Germany and any of them, but no actual state of war existed between Germany and any one of them. It was not until midnight on the same day that Germany notified Russia that she would mobilize unless Russia demobilized within 12 hours, and not until 7 p. m. on the next day that war between Germany and Russia was declared; nor did that declaration make it certain that France or England would be involved.

When the master received the above message, his ship had considerably more than half completed her voyage from New York towards Plymouth in England and thence to Cherbourg in France, the ports at which delivery of the specie shipments on board her had been undertaken according to the bills of lading given for them at New York on July 27. She was a little more than 1,000 miles from Plymouth, the nearer of the two. The message was sent and received in a form such as prevented its above meaning from becoming known to any one but the master, and permitted such meaning to be ascertained by him only through the use of means long before carefully prepared, to be availed of in case the emergency indicated should occur, and kept on board the ship under seal for two years, the seal to be broken by the master only in case he received a message of the character given this message in its untranslated form.

The master obeyed the order to turn back instantly, before revealing the substance of the message to any other person on board. Nine minutes after its receipt the ship was headed for New York, instead of for Plymouth, and the voyage undertaken by the bills of lading had been abandoned. Not until after this had been done did the master inform the subordinate officers and the cabin passengers that he had done it.

A master is ordinarily the owner's representative for the purpose of effecting the safe carriage and delivery undertaken by the ship, and as such a stranger to the cargo. But circumstances of unexpected emergency may without doubt occur during a voyage, such as will change his ordinary relations towards ship and cargo, and, because a discretion must needs be exercised in order to avert or minimize extraordinary peril, threatening all the interests concerned, will make him, for the purpose of exercising it, the 'common representative of all said interests alike. Though a measure adopted by him in the exercise of a discretion so required of him would otherwise be in violation of pending contracts of affreightment, the consent of all concerned will be implied from the fact that in adopting it he has acted as the representative as much of one interest as of any other, and neither will have the right to complain of it as a breach of contract. In the opinion of the District Court the turning back of this ship as above was a discretionary measure taken by the master under circumstances of the kind above referred to, and therefore leaving the owners of these three shipments of specie no right to complain of it as a breach of the contract to deliver their specie at Plymouth or Cherbourg.

The owner of the ship had the burden of proving circumstances actually existing at the time, sufficient to justify such an exercise of discretion on the master's part, present to his mind when he turned back, and also an actual exercise of such discretion by him in view thereof. I have been unable to agree with the finding below that this burden was sustained. As to the circumstances present to the master's mind, it is not contended that he would have turned back, except for the message received from the owner, and, so far as the message conveyed to him an untrue statement of facts, it can have no weight in this connection. Whether or not actually existing circumstances are shown which would have justified abandonment of the voyage is further considered below. But that any actual exercise of discretion by the master has been shown, in the sense necessary for the application of the above principles, I am in any case unable to believe.

The owner's direction to turn the ship back appears from the evidence to have been a specific and unqualified order, leaving the master no choice but to obey. Whether or not, as between him and the owner, disobedience might have been excused by the presence of circumstances then known to the master, but necessarily unknown to the owner, such as made obedience inexpedient, need not be considered, there being no suggestion that there were any such circumstances. If this was the case, no responsibility for results caused by obedience to the order could fall upon the master. By assuming to direct from Bremen, as it did, the course which the ship should take, her owner assumed, for

itself and its ship, all such responsibility, and lost all right to charge the master with any share thereof.

It is said that the owner's message was not a mere order, but informed the master also of facts for his guidance, indicating that the owner still relied upon his discretion, not expecting unreasoning obedience. It is said, further, that the master turned back, not only in compliance with the owner's direction to do so, but in accordance as well with the dictates of his own prudence and sagacity; i. e., in the exercise of his discretion as master under an emergency.

But this requires, in my opinion, a view not justified by the evidence both of the character of the message itself and of the master's action upon it. The statement of facts contained in the message, if true, would have of itself required abandonment of the voyage to Plymouth and Cherbourg; and no independent judgment as to its truth by the master was possible. There can be no doubt that the owner meant him to act upon it as if it were true. Coupled as it was in the message with the unqualified order to turn back, I can see no reason to doubt that the instant obedience given that order by the master was the only course really left open to him, or intended to be left open to him, by the message; there being, as has been stated, no suggestion of any reasons against turning back which the owner could not itself have already considered, and might therefore have demanded an independent judgment on the master's part.

That the above was the view taken at the time by the master himself appears from the terms of the first communication from him to the owner after July 31; i. e., his report in writing to the owner from Bar Harbor, dated August 21, 1916. This was sent 17 days after his arrival there on August 4th, and 2 months before the first of these libels was filed. In it, after stating the latitude and longitude reached upon the voyaye from New York at the time the owner's message of July 31st was received, he said:

"Here we received the order to return, which was immediately carried out."

And thereafter, describing his announcement to the passengers, made as soon as the ship was on her course to the westward, he said:

"I went down and acquainted them with the fact that war had broken out and that I had received orders from the company to return to New York."

Nowhere in this report is any suggestion found that any alternative to compliance with the order was ever present to the master's mind.

In the master's testimony at the trial, given March 31, 1915, which impresses me, as it did the District Court, with its apparent truthfulness, he stated in direct examination that after receipt of the owner's message "there was only one way to do, to go back to the United States"; and in cross-examination, that as the message read, "War had broken out," etc., "there was only this way to take." It is true that he also stated that this seemed to him the best and only course to pursue, aside from the order given in the message, in view of the stock of coal on board, which might not be enough to get him back to New York unless he turned at once. It is true that he declined to

say that the message had relieved him from all further responsibility with respect to the course of the voyage, and did say that it was left in his discretion to do what he chose—"if, for instance, he had not coal enough to return to America." He admitted, however, that, sufficient fuel being on board, as in fact there was, he had to turn back as ordered.

If there is any sense in which the master's act in turning back can be called discretionary with him, the above testimony from him seems to forbid any other conclusion than that such discretion as he may have used was directed and controlled by one only of the interests concerned in a degree altogether too great to permit saying that it was discretion exercised by a common representative of all. Suggestions, or even directions, from owners to their master on a voyage, in an emergency, may not in all cases prevent his determination from being regarded as an exercise of such discretion; but it cannot justly be so regarded when all responsibility for it has been virtually assumed by the owner, as here, and no real scope for choice in the matter left with the master. If, therefore, the abandonment of the contracts undertaken by these bills of lading can be justified at all, it must be justified as the owner's act; and the question is whether or not circumstances are shown which excused nonfulfillment on the owner's part.

[2] 2. The only exception contained in the contracts for delivery of the specie which is relied on for the purpose of exonerating the owner, is the agreement that there shall be no liability for loss or damage occasioned by "arrest and restraint of princes, rulers, or people." The shippers of the specie insist on the literal wording, but the construction contended for by the owner, according to which the clause is to have the same effect as if it read, "arrest *or* restraint," is regarded as more reasonable and as proper.

There having been no actual arrest or restraint of the kind referred to, the owner's act in ordering the ship's return to New York is justifiable, if at all, only by proof that there was at the time ground for apprehending actual arrest or restraint unless she so returned, such as the law of carriage by sea recognizes as the equivalent of actual arrest or restraint. The question is whether or not the requisite proof has been made in this case.

It may be taken for granted that when it has become plainly obvious that continuance of the voyage must necessarily involve arrest or restraint, and can have no other result, such departure from the voyage as is necessary to avoid the danger is not only permissible, but is required of the vessel. She must do what is needful for the purpose of avoiding any actual and presently imminent danger, instead of adhering to a course which can only carry her directly into it. But the evidence here relied on, as will appear, is far from showing the existence of any such situation. What is relied on is, at most, the desirability of keeping the ship out of reach of a future, contingent danger.

The phrase here in question, or some substantial equivalent thereof, has long been familiar in charter parties, bills of lading, and policies of marine insurance. When "arrest and restraint," etc., is a risk assumed by a marine policy, there must be proof, in order to justify aban-

donment to the insurer and maintain thereupon a claim for constructive total loss, that arrest or restraint, etc., was the proximate cause of the abandonment and loss. The peril must operate upon the subject of insurance directly, not circuitously. If there has not in fact been actual arrest or restraint, etc., a loss because of apprehension thereof is not within the policy, unless the apprehension is shown to have been warranted by actual and immediate danger, apparently inevitable and morally certain. This may be regarded as settled by the decisions both in England and the United States, as is hardly disputed on the owner's behalf. Its contention is that a different rule of construction applies in cases arising upon bills of lading, and, in substance, that in such cases apprehension of capture or detention by a hostile power will excuse nondelivery under the exception here relied on, even though no such actual and immediate danger thereof existed, provided that the apprehension was on the whole reasonable.

This exception, like the others wherewith it is usually associated in such documents, is a term introduced into the contract by and for the benefit of the carrier, and therefore to be construed most strongly against the carrier, according to well-settled principles. If another of the exceptions commonly accompanying it, viz., "perils of the seas," means the same, except as regards negligence of master and crew, in a bill of lading as in a marine policy (The G. R. Booth, 171 U. S. 450, 459, 19 Sup. Ct. 9, 43 L. Ed. 234; The Xantho,·L. R. 12 App. Cas. 503, 510, 517; Hamilton v. Pandorf, Id. 518, 526), it is not easy to find sufficient ground for assigning to the words in question, when used in a bill of lading, a meaning broader than that to which their recognized construction, when used in policies of insurance, confines them.

Other stipulations found in the same contract may of course enlarge the scope of the carrier's exemption from liability beyond that permitted by these words alone. But nothing of this kind is found in these bills of lading. No charter party is here involved. The ship was a common carrier, and by the terms of the bills of lading the full common carrier's liability for delivery of the specie at the agreed ports had been assumed; qualified only, so far as this case is concerned, by the above exception. There was no stipulation that the agreed ports of delivery should be safe, nor any express reservation of any right to deal with the specie otherwise than as promised by the bills of lading if in the master's judgment they should become unsafe. There were stipulations of this kind in the contracts under consideration in the cases here most relied on by the shipowner, viz.: The Styria, 186 U. S. 1, 22 Sup. Ct. 731, 46 L. Ed. 1027; Nobel's Explosives Co. v. Jenkins, [1896] L. R. 2 Q. B. 326; The Teutonia, L. R. 4 P. C. 171; The Express, L. R. 3 A. & E. 597. No sufficient warrant is found in them for the claim that the recognized construction in insurance cases is inapplicable to the exception relied on in the present case.

That the arrest or restraint which will excuse failure to make the delivery undertaken by a contract of affreightment unqualified, except as in these bills of lading, must be an actual and operative restraint, and that no merely expected and contingent restraint affords sufficient ex-

cuse, has been settled law at least since Atkinson v. Ritchie, 10 East, 530. If, as in that case, an embargo laid by the country of the port where the cargo was to be shipped is relied on, reasonable apprehension that such embargo will be laid does not excuse the carrier, when in fact it was not laid. If, as in Brunner v. Webster, 5 Com. Cas. 167, sanitary regulations forbidding discharge at the port of delivery are relied on, such regulations must have been in force at the probable time of delivery; a justifiable belief that they would be in force, if mistaken, will not be enough to bring the failure to deliver within the exception.

If, as was done in Balfour et al. v. Portland, etc., Co., 167 Fed. 1010, by the District Court in Oregon, the attending and existing circumstances at the time these contracts of affreightment were made be examined in order to determine the meaning presumably intended by both parties to be put upon this exception, no sufficient reason for making it include a merely apprehended danger of capture or detention not present or imminent can be found.

On July 31, 1914, when the owner abandoned the voyage, there was, no doubt, danger that an actual state of war would arise whose existence would make Plymouth and Cherbourg hostile ports as regarded the vessel. But this was not a danger arising after the voyage had begun; there was danger that just such a war would arise when the bills of lading were given, four days before, on July 27th. That this very danger was then present to the minds of both parties to these contracts of affreightment is not and could not be disputed. The ship was capable of being used as a vessel of war by the German government, and liable to be taken and used by it as such if within its actual control; a fact which made her more liable than an ordinary German merchant vessel to arrest or capture by either England or France as soon as the apprehended state of war should exist. This fact also must, we think, be regarded as present to the minds of both parties to the above contracts. Yet the owner of the vessel, with the above situation in view, undertook delivery of the specie at Plymouth and Cherbourg, under contracts which reserved to it no right to abandon or vary the voyage, should those ports become unsafe, but which made it, according to principles long settled and universally understood, insure the delivery as agreed unless "arrest or restraint of princes," etc., should prevent. It appears that the specie might at the time have been shipped on British or French vessels from New York for the above ports, as to which said ports would not have become hostile in event of war, and that it was shipped on this German vessel in order to take advantage of her greater speed. I find nothing in any of these circumstances tending to warrant a construction of the exception under consideration in the shipowner's favor. Whether the danger of war would increase or diminish during the five or six days necessary to get the specie delivered according to the bills of lading, neither party can be said to have known; but the owner deliberately took the risk that the danger might increase, and cannot, therefore, in justice to the shippers, without proof that the only exception relied on operated to prevent delivery in the accepted meaning of its terms, be permitted to aban-

don the attempt to deliver without paying such damages as were thereby sustained.

An actual state of war, arising either before or after the voyage contracted for has begun, whereby ship or cargo are rendered liable to capture and condemnation, may justify abandonment of the voyage in order to avoid such capture, when reasonable grounds for apprehending actual capture are shown. Delivery at a port of destination which such actual state of war has made a hostile port so far as the vessel is concerned, would in such a case be excused. The German Code, in articles 629, 634, a part of the law of the flag for the purposes of this case, has express provisions to this effect. Actual war, indeed, so coming into existence, makes it the ship's duty to her own sovereign not to enter a hostile port. Atkinson v. Ritchie, 10 East, 530, 533, 534; British, etc., Co. v. Sanday, etc., Co., App. Cas. 1916, 650. But no case is found in which, there being no actual state of war, abandonment of a contract like this has been excused under the exception here relied on, because of mere apprehension that actual war might exist before delivery according to the contract could be made.

If, in the case of an actual state of war, arising after the voyage has begun, the ship or cargo might, under some circumstances, be put in immediate actual danger of capture from the moment in which the state of war became existent, so as to make it proper to say that reasonable ground for apprehending immediate war, was, for practical purposes, equally reasonable ground for apprehending immediate actual arrest or restraint by capture, no situation of this kind, sufficient to bring the owner's abandonment of the voyage within the exception relied on, seems to me proved in the present case.

Unless something had happened to delay the ship, such as is not shown to have ever happened on any of her numerous prior voyages to the same ports, the specie to be delivered at Plymouth would probably have been delivered there by 1 a. m. on August 3, 1914, and that for delivery at Cherbourg, by 8 a. m. on the same day. It is to be noticed that the season of the year was that at which delay by weather conditions was least to be expected. The discharging facilities kept ready at both ports had enabled the ship, upon all but one of 13 trips preceding this, as appears from her log, to leave Plymouth within an hour from her arrival; and the same is true as to Cherbourg. Her longest stop at Plymouth had been 78 minutes; at Cherbourg, 66 minutes. Tenders controlled by her owner were regularly found awaiting her arrival, into which passengers, mails, and specie were discharged alongside. She did not go to a dock at either port. Plymouth did not become a hostile port, as regarded the steamship, until August 4th, at 11 p. m., when England declared war with Germany. Cherbourg did not become a hostile port until 6:45 p. m., on August 3d, when Germany declared war with France. It is true that Germany had declared war with Russia at 7:10 p. m., on August 1st, at which time the ship would still have been 30 hours distant from Plymouth; but it can hardly be claimed that a state of war with Russia only exposed the ship to any immediate risk of capture. And after landing the Cherbourg specie as above, 11 hours before any war with France arose, another

23 hours' run at her usual speed between those ports would have brought her to Bremen, her home port, by 7 a. m., on August 4th. The evidence shows no reason for apprehending detention at Cherbourg before 8 a. m., on August 3d, nor until after 6:45 p. m., on that day. Nor is any reason shown for apprehending capture on the way from Plymouth to Cherbourg and thence to Bremen. English men-of-war only could have interfered with the ship, and she would have been at Bremen before any state of war with England existed. German vessels are shown to have used English ports and coast waters unmolested during the whole of August 4th. Germany's refusal to give the requested assurance regarding Belgium, the determining cause of England's participation in the war, did not become a certainty before the last hours of that day.

So far, therefore, from proving actual and immediate danger of war simultaneously involving actual and immediate danger of capture or detention on July 31st, when the ship turned back, the evidence shows that this specie could probably have been delivered as agreed before any actual war began or any immediate danger of capture or detention arose. The carrier's abandonment of the voyage deprived the shippers of the specie of all chance of having it so delivered. Thereby the carrier took the risk that the actual course of events might fail, as it did, to show actual and immediate danger threatening the ship, either at the time or before she could have made delivery.

[3] The carrier's act cannot be justified, as in The Styria, 186 U. S. 1, 22 Sup. Ct. 731, 46 L. Ed. 1027; Nobel's Explosives Co. v. Jenkins, [1896] L. R. 2 Q. B. 326, "apart from the terms of the bill of lading" —on the ground that the master's "duty to take reasonable care of the goods intrusted to him" required it. For that purpose discretionary action by the master would be necessary, which, as above held, is not shown. Nor does the evidence show that regard for the safety of the specie entered into the owner's determination to abandon the voyage. No reason appears for apprehending that capture or detention of the ship would, under the circumstances, have involved loss to the owners of the specie. The ship's value was considerably greater than the value of the specie, or the entire cargo on board. It was far more important to the owner of the ship than to the owners of the specie that she should avoid capture or detention by England, France, or Russia. The evidence shows also that the order to turn this ship back to New York, instead of being a single order given with particular reference to this ship, or her cargo, or her relations thereto, was only one of many other like orders similarly transmitted during the same day to all steamships at sea belonging to the same owner, and then on voyages tending to bring them, if continued, within regions where, in case of actual war between Germany and the other countries named, their capture or detention might become possible. The owner's evident object was, not to avoid actual immediate danger of capture or detention then threatening these ships, but to keep them all as far removed as possible from any and all such regions of possible future danger. This may well have been the course most for the owner's advantage. But, under the contracts here sued on, it cannot justly be

held that the circumstances proved entitled her owner to divert this steamship from the voyage undertaken as above, without incurring any liability to the owners of the specie for their loss thereby caused. We know nothing more at present as to the amount of their loss than that it was substantial. Whatever they may prove their respective losses to have been, I consider the libelants in Nos. 1196 and 1199 entitled to recover against the steamship.

[4] In regard to the cases Nos. 1197 and 1198, wherein the libelants were passengers, no reason is found for disturbing the result below. Not only did the contracts with these libelants permit to the ship a far greater liberty to change or abandon the voyage than was permitted by the bills of lading, but they expressly required written notice of any damage claim, with full particulars, within 10 days after landing from the steamship, and it is admitted that no such notice was ever given. The libelant in 1197 accepted the return of his passage money; the libelant in 1198 accepted instead passage paid for by the claimant in another vessel.

BINGHAM, Circuit Judge. In Nos. 1196 and 1199, I am of the opinion that the decrees of the District Court should be reversed. The facts are substantially the same in the two cases; the only difference being that in the Guaranty Trust Company Case the consignment of gold was to be delivered at Plymouth for transportation by rail to London, while in that of the National City Bank there were two consignments of gold, one to be delivered at Plymouth for transportation to London, and the other at Cherbourg for transportation to Paris.

In the opinion of the District Court the claimant was held to be excused from performing its contracts of carriage upon the ground that the telegram received by the master on the evening of July 31, 1914, from the managing directors of the claimant, saying, "War has broken out with England, France and Russia. Return to New York," stated facts constituting an exigency which authorized him to exercise the discretion vested in the master of a ship by the maritime law, and that, in turning back to America and abandoning the venture, he exercised his discretion and acted within this implied power; that the managing directors of the claimant, when they said in the telegram that war had broken out with England, France and Russia, in substance stated the truth regarding the political situation as it then existed in Europe; and that the claimant could avail itself of the master's exercise of discretion based on that information as a justification for its failure to perform the contracts.

Counsel for the claimant contend (1) that the foregoing ground upon which the decision of the District Court proceeded and upon which the decrees in these cases were based, is right; (2) that if the master did not act in pursuance of his implied authority, but abandoned the venture because the claimant, through its managing directors, ordered him to return to America, nevertheless, in view of the threatened danger of war, the claimant was justified in so ordering the ship back to America; and (3) that the claimant can justify its failure to perform its contracts under the exception contained in the

bills of lading relating to "restraint of princes, rulers or people"; that, although war had not been declared and did not exist, the threatened danger of war was the equivalent of a declaration of war, or of authorized acts of war, and operated directly as a restraint of princes.

It does not seem to me that any of these propositions are right as applied to the facts in these cases.

I. The ship took on board the consignments of gold on the 27th of July, 1914, and set sail at about 1 o'clock on the morning of the following day. At that time England, France, Russia, and Germany were at peace, although there was threatened danger of war. Whether on that day the claimant apprehended that the war clouds were probably clearing, or that in the event of hostilities the ship would make her trip before war broke out, is of little importance. Knowing that these countries were at peace, but that there was threatened danger of war, it made the contracts and took on board the shipments of gold for delivery at Plymouth and Cherbourg. And the evidence discloses that while the master may have had some anxiety after he set sail, and down to the evening of the 31st of July, as to the real condition of the political situation in Europe, he, nevertheless, proceeded at the rate of about 22½ knots an hour, making the usual time, without taking any precaution with reference to the outbreak of war until the night of the 31st of July, at about 10:09 o'clock, ship's time, when he received the telegram above set forth, and immediately turned his ship about for America. Having turned about, he then took such precautions as he thought necessary to avoid detection by painting his smokestacks, dispensing with sidelights, and darkening the portholes and cabin windows. It is evident from this that the immediate change in the course of the ship, resulting in the abandonment of the venture, was due to the receipt of the telegram on the night of July 31st.

That the master, upon receiving the telegram, acted on the idea that he was relieved from exercising his discretion as to the course the ship should take, if he had coal enough to obey the order to return to America, is clearly shown in his answers to the following questions:

"Q. Assuming that you had enough fuel to make the voyage, you had to make the voyage that you were ordered to make, had you not? A. Yes, sir.

"Q. And that was to turn back to America? A. Yes, sir."

And to preclude the necessity of any exercise of discretion by the master, even as to the supply of coal, the managing directors, before they sent the telegram, had the location of the ship and the amount of coal on board computed, and knew that the ship had sufficient coal for the return trip.

The ship arrived in Bar Harbor on August 4th, and, after the master had landed his passengers, discharged the gold, taken on board a supply of coal, and discharged the balance of his cargo, which took until the 21st of August, he on that date made a written report to his company at Bremen, in which he stated in detail what occurred on the trip from the time the ship left New York until it reached Bar Harbor. In this report, among other things, he said:

"On July 28, at 3 a. m., we passed Ambrose Channel Lightship, steamed eastward on the prescribed course, up to July 31, 46° 46′ N, 30° 21′ W. Here

we received the order to return, which was immediately carried out. While the ship was still in the act of turning, I directed that the passengers of the first and second cabin be requested to repair to the smoking room, and when the ship was on the course to westward, I went down and acquainted them with the fact that war had broken out and that I had received orders from my company to return to New York."

This is not the language of one in authority, stating action taken by him in the exercise of his discretion, but of a subordinate, informing his superior that he has received his order, and carried it out. It is a frank statement, free from equivocation, and in no way misleading. It was not formulated to meet a legal position, for these suits had not then been brought, and plainly states the truth—that he had received the order and obeyed it.

When the master had under consideration a matter of importance concerning the voyage as to which he had not received special directions, and requiring the exercise of his discretion, it was his custom to proceed in a deliberate and formal manner by calling his officers in ship's council. This he did on the evening preceding the receipt of the telegram, when he decided to continue on his voyage to Plymouth; and again, on August 3d, when an exchange of signs between the cruiser Essex and the station at Halifax was overheard, and he decided to run for the port of Bar Harbor rather than to New York. In the report to his company he alludes to this, and says:

"As signs from the Essex were not very strong, and she might be watching the port of New York just as well as the port of Boston, I called my officers for ship's council, in which it was decided to run into the port of Bar Harbor."

And again, in his testimony, in speaking of this matter, he said:

"I called my officers together, and said to the chief officer and to the second officer, who were there, 'Gentlemen, we are hearing these wireless signs getting nearer; they may be before New York Harbor; they may be before Boston Harbor; I think it is advisable that we should go out of the way and turn up north, and go to Bar Harbor, which is a path which is not trodden so much by steamers of our size and kind.'"

From these circumstances, and others presented in the case, the reasonable inference is that his course of conduct on the evening of the 31st of July in turning back to America was not due to the exercise of discretion on his part, but was due directly to the order of his superior and in obedience thereto.

II. If, however, it could properly be found that the master acted upon the information contained in the telegram, exercised his discretion and determined to return to America, the claimant cannot avail itself of his decision as a defense to these actions. The information which the managing directors gave was false. War had not broken out, but it was purposely stated that it had to control the exercise of the master's discretion, if he wished to exercise it, and did not at once follow their peremptory order. To permit the claimant to avail itself of the master's decision obtained under such circumstances would be the equivalent of according to one the protection of a judgment which he had procured through fraud. That such was the purpose of the

managing directors in sending the telegram is plainly deducible from the evidence presented by the record. From this it appears that, at the time the message was sent, and at the time it was received, war had not been declared and had not broken out between England, France, Russia, and Germany, or between any two of those nations; that at 2:45 o'clock in the afternoon of July 31st, when the telegram was sent, the managing directors had simply received information that the German emperor was to issue a proclamation declaring a state of war, which would have the effect of putting Germany on a war footing, but would "not amount to a declaration of war against or actual hostilities with any other nation." Their information amounted to nothing more than that a decree of a state of martial law for Germany was about to be issued. It further appears that the managing directors, in the stipulation filed by the claimant in these cases as evidence, stated that this decree was "the immediate reason for the recall of the Cecilie"; that all other political advices and facts which they had, without knowledge that the government was to declare a, state of war, would not have caused them to take immediate action in regard to their vessels; that "this decree of a state of war alone can be designated as a decisive fact inducing us to recall the Cecilie"; and that the reason why they stated in their telegram to the master that war had broken out, instead of stating the facts as they existed, was that they deemed "every other information in regard to the political situation, every statement that was not absolutely clear and comprehensive in regard thereto, as inadvisable, and could only lead to misunderstanding and unsafe resolutions," and that the wording of their telegram "occurred purposely in the form that we reported the war as already having broken out, and has nothing to do with the wording of our telegram code."

The conclusion is irresistible that the telegram was primarily an order, and the information it gave as to the political situation was purposely false, and so framed that the master would be compelled to obey the order, whether he wished to exercise his discretion or not.

It is useless to discuss the question whether, if the managing directors had stated in the message the true condition as to the political situation, an exigency would have been presented which would have authorized the master to exercise his discretion, for the true situation was not presented to him, and, if it had been and he had been permitted to exercise his discretion, it is entirely problematical what course of action he would have pursued.

III. As the abandonment of the venture by the ship's return to America was due to the peremptory order contained in the telegram, we will consider the question whether the claimant, apart from the exceptions contained in the contracts, can justify its conduct in ordering the ship to return to America because of the threatened danger of war.

In Atkinson v. Ritchie, 10 East, 530, this question was considered. In that case the action was assumpsit for breach of an agreement in not loading a complete cargo of hemp. Ritchie, the master and owner of the ship Adelphi, chartered her to Atkinson, a London merchant,

agreeing to proceed to St. Petersburg and there load from the factors of Atkinson a complete cargo of clean hemp and 80 tons of iron for ballast, not exceeding what she could reasonably stow, and, being so loaded, to proceed to Woolwich and London and deliver the same on being paid the freight, "restraint of princes and rulers during said voyage always excepted." The ship arrived at Cronstadt, the port of St. Petersburg, on the 16th of September, 1807, where Ritchie proceeded to take on cargo under the charter party, and continued loading with all due diligence until the 25th of that month. He had then taken on board between 70 and 80 tons of iron, a sufficient quantity for ballast. "On the 25th of September there was a general rumor of an embargo being intended to be laid by the Russian government on all British vessels, and there was every appearance that it would take place immediately; but it did not in fact take place then, nor until six weeks afterwards." But on the 25th, the British consul, expecting that the embargo might take place immediately, caused a letter of advice to this effect to be written to Ritchie, in consequence of which he gave instructions to leave off screwing down any more hemp—which was the usual mode of loading—and to fill the ship as fast as possible by hand, and the work continued by hand until 6 o'clock that night, when she was filled, as far as could be done, in that manner. On the evening of the 25th the ship sailed with a cargo of about half what she could have carried, although there was at the time hemp ready to be loaded which would have completed loading her. "Ritchie acted bona fide and as an honest man under the existing circumstances, and there was a *reasonable and well-grounded apprehension for his acting as he did;* and he brought home as complete a cargo as he could under the circumstances." The Adelphi arrived in London, delivered her cargo there to Atkinson, who refused to pay the freight, as a little more than a moiety of the quantity of hemp stipulated for by the charter party was brought. On behalf of the master of the ship it was contended that "an exigency had arisen, and it was a paramount duty of the master, imposed upon him by law, to act for the benefit and safety of the ship, the crew and the cargo, and, still more, for the state to which he belonged, and that the reasonable apprehension of danger created the exigency, and that the master was in duty bound to do the best he could for all concerned, to preserve his ship for the state, as well as for the individuals concerned, to prevent them from falling into the hands of the enemy; and this was evidently a hostile embargo." In delivering the opinion of the court, Lord Ellenborough answered this contention as follows:

"The parties are the merchant freighter on the one hand, and the master on the other; each contracting for himself with the other, as principals. Under such circumstances, any constructive agency on the part of the defendant, in his character of master, for the plaintiff, as the freighter of the goods, is wholly out of the question. Their relative claims upon, and duties in respect of, each other are conclusively fixed and defined by the terms of their own written contract. No exception (of a private nature at least) which is not contained in the contract itself can be engrafted upon it by implication, as an excuse for its nonperformance."

This case clearly shows that the claimant, being one of the principals to the contract of carriage, had no discretionary authority vested in it by which it could justify an abandonment of its contract obligations, in case of the threatened danger of war, even though it honestly believed that the threatened danger presented an exigency, and that it must justify its conduct in abandoning its contracts, if at all, under the exceptions contained therein.

IV. The question remains whether the contracts of shipment as expressed in the bills of lading contain exceptions which would excuse the claimant from the performance of the contracts. The exceptions in the bills of lading upon which counsel for the claimant rely—the two contracts being alike so far as this matter is concerned—are those relating to the "restraint of princes, rulers, or people."

Lord Wrenbury, delivering an opinion in the House of Lords, in the case of British & Foreign Marine Insurance Co., Ltd., v. Samuel Sanday & Co., L. R. [1916] A. C. 650, 671, in discussing the meaning of the words, "restraint of kings, princes, and people," in a policy of insurance, and what would constitute such a restraint, said:

"A declaration of war by the sovereign is a political or executive act, done by virtue of his prerogative, which creates a state of war. A state of war is a lawful state, and is one in which every subject of his majesty becomes an enemy of the nation against which war is declared. The declaration of war amounts to an order to every subject of the crown to conduct himself in such way as he is bound to conduct himself in a state of war. It is an order to every militant subject to fight as he shall be directed, and an order to every civilian subject to cease to trade with the enemy. * * * 'A declaration of war imports a prohibition of commercial intercourse and correspondence with the inhabitants of the enemy's country, and that such intercourse, except with the license of the crown, is illegal."

In that case it was held that the declaration of war between England and Germany on the 4th of August, 1914, rendered trading by an English ship at a German port illegal, and would render the master of the ship with a cargo destined for such port subject to arrest and his ship and cargo subject to confiscation; that the declaration of war by the sovereign, being a political or executive act, operated directly upon the master, ship and cargo and constituted a restraint of kings, princes, and people within the meaning of the policy of insurance, although they were not subjected to actual or physical restraint.

The cases we are considering differ widely from the one passed upon by the House of Lords, for here, at the time the ship turned back for America and abandoned the voyage contracted for, the sovereign powers of Germany, England, and France had not declared war, the voyage was not illegal, and there was no sovereign act in existence which operated or could operate as a restraint within the meaning of the clause, "restraint of princes, rulers, or people," either directly or indirectly. No case has come under my observation where it has been held that there was a restraint of princes within the meaning of the clause in the absence of an act of a sovereign power or state rendering the venture unlawful; or, if the sovereign act was that of a foreign power or state, so that the venture was lawful, unless the circumstances disclosed physical restraint due to that sovereign act of a direct and

operative nature. Where the venture is rendered illegal by a declaration of war, the legal restraint operates directly and immediately upon the master, ship, and cargo, and makes his dealing or attempting to deal with the enemy unlawful. British & Foreign Marine Insurance Company, Ltd., v. Sanday & Company, supra. Whereas, if the venture is lawful (the ship and cargo being that of a neutral power), and the port of destination is blockaded, or the cargo is contraband and destined for a belligerent port, it must appear that restraint of a physical nature was operative to come within the meaning of the clause. Nobles Explosives Co. v. Jenkins, [1896] L. R. 2 Q. B. 326; Rodoconachi et al. v. Elliott, L. R. 9 Common Pleas Cas. 518; The Styria, 186 U. S. 1, 22 Sup. Ct. 731, 46 L. Ed. 1027; Balfour, Gutherie & Co. v. Portland & Asiatic S. S. Co. (D. C.) 167 Fed. 1010. And that if it appears the abandonment of the venture was to avoid encountering a future peril to which the ship or cargo might become subjected, the necessary restraint, within the meaning of the clause, would be wanting. Atkinson v. Ritchie, supra; Mitsui & Co. v. Watts, Watts & Co., 15 Law Times Reports, issued April 15, 1916; Hadkinson v. Robinson, 3 Bos. & P. 388; Kacianoff v. China Traders Insurance Co., [1913] 3 K. B. 407.

Here there was no declaration of war or authorized acts of war involving the nations in question at the time the ship abandoned her contract. The venture was legal, not illegal, and her return to America was not due to any restraint of a sovereign act, legal or physical, but was to avoid a supposed future peril to which she might become subjected.

In Nos. 1197 and 1198, the actions brought by Charles Rantoul, Jr., and Maurice Hanssens, passengers on the steamship Cecilie, to recover for failure to transport them from New York to Cherbourg and Plymouth, respectively, I agree with the conclusions reached in the opinion of the District Court, but not for the reasons there given. The tickets issued to these passengers contained the following provision:

"No claims under this ticket shall be enforceable against the shipowner or its property or the agent or passage broker, unless notice thereof in writing, with full particulars of the claim, be delivered to the shipowner or agent within five days after the passenger shall be landed from the transatlantic ocean steamer at the termination of her voyage, or, in case of the voyage being abandoned or broken up, within ten days thereafter."

And the claimant in its answer sets forth this provision of the contracts and alleges that no such notices were given within either of the periods so specified. As the voyage was abandoned or broken up by the ship's return to America, it became incumbent upon the libelants, in order to recover damages for breach of their contracts, to prove that notices of their claims were given within the time specified in the stipulation above referred to. This they not only failed to do, but admitted that no notices were given.

The libelants seek to avoid the effect of this stipulation on the ground that the ship, by deviating or abandoning its voyage, displaced the contracts and thereafter made the carrier an insurer against all loss and deprived it of the benefit of the conditions contained in the con-

tracts; and, in support of their contention, they refer to certain cases in which the carrier was held liable for loss or damage to goods occurring during or after a deviation had taken place. Morrison v. Shaw, S. & A. Co., Ltd., [1916] 1 K. B. 747; Brunner v. Webster, 5 Commercial Cases, 167. These cases do not seem to me to be in point. There the plaintiff was not suing on the contract of carriage, but upon the common-law obligation of the defendants for loss of or damage to goods occurring after the voyage had been abandoned; while here each libelant is suing upon the contract and must take it with all the stipulations which it contains.

A majority of the court concurring, it is ordered, adjudged, and decreed as follows:

In Nos. 1196 and 1199 the decrees of the District Court are reversed, and the cases are remanded to that court, with directions to enter in each an interlocutory decree for the libelants, and for further proceedings thereon in accordance with law, and the appellants recover their costs of appeal.

In Nos. 1197 and 1198 the decrees of the District Court are affirmed, and the appellee recovers its costs of appeal

PUTNAM, Circuit Judge (dissenting). These proceedings originated in several libels in the District Court, in each of which the decree of the District Court was in favor of the steamship Kronprinzessin Cecilie. Several appeals have been taken, which appear in this court as Nos. 1196, 1197, 1198, and 1199, but they all involve the same main question, and can be conveniently disposed of by a single opinion. The facts herein stated cover all the cases, except as we may otherwise explain.

The learned judge of the District Court said:

"In the first case, the Guaranty Trust Company of New York seeks to recover damages for breach of contract, by the steamship, in failing to carry a consignment of gold from the port of New York to the port of Plymouth, England. The libel alleges that on July 27, 1914, the steamship was lying in the port of New York, bound for Bremerhaven, Germany, by way of Plymouth, England; that on that date the libelant delivered to the steamship in good order and condition ninety-three kegs of gold bullion, of the agreed and declared value of $4,942,936.64, to be carried to Plymouth, England; thence to be forwarded to London; to be there delivered in like good order and condition to the order of the libelant, in consideration of $9,268 prepaid freight; that the steamship delivered to the libelant a bill of lading therefor; that, in violation of her contract, the steamship, when about 900 miles from Plymouth, abandoned her voyage and put back to Bar Harbor, Me., where, on or about August 8, 1914, the libelant accepted redelivery of the 93 kegs of gold from the steamship, under an agreement that such redelivery should not constitute a waiver of libelant's claim for breach of contract. By reason of such failure of the steamship to deliver the gold at Plymouth, the libelant says, it has suffered damage exceeding the sum of $1,104,467.43. The libel was subsequently amended, increasing the amount claimed as damages to $1,793,278.22; and the libelant says that no part of this sum has been paid.

"The answer admits the receipt of the 93 kegs of gold bullion, and alleges that the carriage of the same was undertaken by the claimant, subject to the conditions and exceptions contained in the bill of lading, which is made a part of the answer; subject also to the possibility of the ship being prevented from concluding her voyage and being forced to put back into a port of refuge, in case of outbreak, or threatened outbreak, of the European war. It ad-

mits that the steamship turned back on her course, and says that at the time of turning back she was about 1,070 miles from Plymouth. It alleges that the decision of the master to return to a port in the United States was based upon credible information received by him from the North German Lloyd office at Bremen, by wireless message, that war had broken out, involving Germany and Russia, France, and England, and that this message, considered in conjunction with the information with respect to the European crisis received by him prior to sailing, furnished reasonable ground for him to apprehend that the steamship and cargo would be captured if she continued on her voyage, and required him, in the exercise of sound judgment and discretion, to put back to a port of refuge; that, though war had not actually broken out at the time of the receipt of this wireless message, still the master, in anticipation of an outbreak of hostilities, and the consequent danger of arrest of the members of his crew, the arrest or probable detention and discomfort of his passengers, and the capture of his ship and cargo, was fully justified in adopting the course which he did adopt.

"The answer further alleges that the course followed by the captain was successful; that his return to a port of refuge, and the delivery of the specie to the parties entitled to it, were accomplished without the capture or detention of a single passenger or member of the crew, and without loss or damage to any of the specie, or to any other part of the cargo.

"As a third defense, the answer asserts the exception in the bill of lading against liability for the loss or damage 'occasioned by arrest and restraint of princes, rulers, or people.'

"Certain facts are stipulated: The libelant is a corporation organized under the laws of the state of New York, having its office in New York and a branch office in London. The claimant, North German Lloyd, is a corporation organized under the laws of Bremen, existing under said laws and the laws of the German Empire, and is the owner of the Kronprinzessin Cecilie. The steamship was built in 1907, at a cost of about $4,500,000. On July 27, 1914, the libelant shipped on board the steamer 93 kegs containing gold bars, owned by the shipper, of the value, at the time and place, as set forth in the libel. By the terms of the contract, the gold was to be carried by the steamer from New York to Plymouth, England; thence to be forwarded, at the steamer's expense, but at the owner's risk, to London, unto the Guaranty Trust Company, of New York, or its assigns, subject to the provisions and exceptions of the bill of lading. The steamer was fully manned, outfitted, and equipped, and sailed on the voyage from New York on July 28, 1914, about 1 o'clock in the morning. She continued on the voyage until the night of July 31st, at about 9 minutes past 10 o'clock in the evening, ship's time, when she turned back towards New York. At the time of turning back the steamer was a distance of about 1,070 nautical miles from Plymouth. Just before turning back, about 10 o'clock in the evening a wireless message was received on board of the steamer from the directors of the North German Lloyd at Bremerhaven, in private code. The translation of the message reads as follows: 'War has broken out with England, France, and Russia. Return to New York.' It was signed by the managing directors of the claimant company, after having been informed of the intention of the government to dispatch on that day the notes to Russia and France which are referred to in the German White Paper, and after a general warning by the admiralty to the German merchant marine, and after the directors had received information that a declaration of a state of war had been perfected and would shortly be proclaimed.

"Certain historical facts are agreed upon, as part of the proofs. Those stipulated as having happened before the ship sailed from New York are as follows:

On June 23, 1914, Archduke Francis Ferdinand, of Austria, and his wife, the Duchess of Hohenberg, were assassinated at Sarajevo, the capital of Bosnia; on July 23d, Austria sent an ultimatum to Servia; on July 24th Russia urged that Austria abandon the time limit of her ultimatum 'in order to prevent consequences equally incalculable and fatal to all the powers which might result from the course of action followed by the Austro-Hungarian government'; the Russian government informed the other powers that, if the Austro-Hungarian government should make war on Servia, Russia could not

allow the conflict to be settled between those two countries alone; the French ambassador at St. Petersburg gave the English ambassador at St. Petersburg to understand 'that France would fulfill all the obligations entailed by her alliance with Russia, if necessity arose, besides supporting Russia strongly in all diplomatic negotiations'; on July 25th Austria declined the Russian request for extension of time limit in ultimatum to Servia; Austria advised Servia and the other powers that she considered Servia's reply unsatisfactory; the Austrian minister left Belgrade at 6:30 p. m.; the Servian government moved from Belgrade to Nish the same evening; Germany confined her Alsace-Lorraine garrisons to barracks, and placed the frontier works of Alsace-Lorraine in a complete state of defense; Servia ordered mobilization; Russia began to take military precautions; martial law was proclaimed in Austria.

"On July 26th Austria severed diplomatic relations with Servia, and sent passports to the Servian minister; Austrian mobilization against Servia was decreed; Austria advised Russia that she sought no territory of Servia, and did not intend to impair the sovereignty of that country, but that, aside from that, she was prepared to go to the furthest extremes to obtain satisfaction of her demands; the Servian army began mobilization.

"The history shows that all powers thereupon became promptly involved, including Austria, Russia, Germany, France, and England. Thereupon, on July 30th, the German ambassador at St. Petersburg was directed to make the following declaration to the Russian government: 'Preparatory military measures by Russia will force us to counter measures, which must consist in mobilizing the army. But mobilization means war. As we know the obligations of France towards Russia, this mobilization would be directed against both Russia and France. We cannot assume that Russia desires to unchain such a European war. Since Austria-Hungary will not touch the existence of the Servian kingdom, we are of the opinion that Russia can afford to assume an attitude of waiting. We can all the more support the desire of Russia to protect the integrity of Servia, as Austro-Hungary does not intend to question the latter. It will be easy in the further development of the affair to find a basis for an understanding.'"

We will add that it is true that the Russian secretary at this time—that is, on July 30th—declared that there had been no mobilization; but events came on so rapidly that, while it must be admitted that no flagrant war had broken out involving France, Russia, and England with Germany at the time the wireless message came to the captain of the Cecilie from the North German Lloyd office, yet the mobilization on the part of Russia was in hand, and that mobilization meant flagrant war within the meaning of the message of the North German Lloyd office by wireless, so that for all practical purposes, with reference to this steamer, she was on mid-ocean, and at least a full day's sail from Plymouth, and in the full hazard of that position in mid-ocean, bound for the port of a threatened enemy.

To test this, let us look at the actual position in which the shippers placed her. The war which ensued finally came quickly on, involving all the great powers of Europe, England, France, Germany, Austria, and Russia. The ship in this case was a German ship. She was chartered at New York for a voyage to Bremerhaven, touching first at Plymouth, where she was to deliver the most valuable part of her cargo at what might be a hostile port, and then again at Cherbourg she would deliver more of her gold, which might be another hostile port, and then proceed to her own home port at Bremerhaven. She represented a value of more than $11,000,000, largely of what might be hostile gold, shipped for London and Paris, with a valuable general cargo of $139,-335.

The Cecilie had aboard 1,892 persons of mixed nationalities; 354 Americans, 667 Germans, 406 Austrians, 151 Russians, and other nationalities of minor amounts, involving nearly all the nationalities of Europe, including some nationalities that would have been hostile, if war had broken out, to any port she might touch, including her port of final destination.

In the event of flagrant hostilities, the master of the ship would have represented the entire enterprise, and would have been quite certain to fall into hostile hands, wherever he might have been, unless in an American port; so that, in case of hostilities, the vessel would have been safe only in America, and by his turning back he accomplished the safety of all concerned. It is true that when he sailed from New York the master was aware of the possibility of the ship being prevented from completing her voyage, and being forced to put back into a port of refuge. He protected himself by using in his bill of lading the usual exemptions from the hostile acts and purposes of princes and nationalities. So far as this ship is concerned, and these bills of lading were concerned, they were not hampered by any peculiar provision of any laws applicable to the ship; but the ship and cargo and passengers were protected to the full extent of the rules of the general international laws that are known to all the nations of the world.

When the ship sailed, and gave her bills of lading, the possibility of war was known; but the amount of freight charged was on the basis of only $9,268 for the gold belonging to the Guaranty Trust Company, and on a like basis for the rest of the gold, and it contemplated imposing no particular hazard on the ship, and the ship, undoubtedly loaded her cargo on the 27th day of July apprehending that the war clouds were probably clearing. The record shows that as late as July 30th those trading with a hope of peace were justified in doing so, and the rates of freight charged for this ship were based on that hope. Instead of that, however, the clouds gathered with remarkable rapidity; so much so that within four days after sailing it became evident that they were about to break, and that for the protection of the entire enterprise the ship must return to a neutral port.

Captain Polack testified that meanwhile, by communicating with vessels by wireless and otherwise, he had received information during the intervening period in regard to the progress of events, and was waiting for further information by wireless, and that, when he turned back, he acted, not only in accordance with his instructions, but also on the idea of his own best judgment, in running no further danger.

It is unnecessary to cite authorities on this topic, because the law is too well settled, and the underlying principles are all too uniformly accepted, in the circumstances of this case, to the effect that it was not only the right, but the duty, for the master of this ship not to delay, and hazard running his vessel into a possible hostile port, but to use justifiable precautions and reasonable grounds for apprehension of capture, and to have due regard to the uncertainties of the ocean, and leave reasonable margin for the state of weather and for accidental detentions; and under the circumstances of this case the decision to turn back was justifiable, whether it came from the master or owners.

It is also plain that the positions of the libelants in these cases would reverse all these propositions, had they been accepted, and would have involved this ship and the entire enterprise in hazards which the master had no right to assume. On the broad ocean, with no pilot but his own foresight and ingenuity, it is the duty of a master under such circumstances, not only to use diligence in escaping actual danger, but to use it in avoiding what is threatened; and, considering the number of people and the value of the ship, and the property which she had aboard, and the complexities of the hostilities by which she was endangered, the exigencies cannot be too strongly described.

This ship lost nothing, and the holders of her bills of lading lost nothing; but in regard to this particular shipment by the Guaranty Trust Company, if this libel is sustained, the company would receive exchange to the amount of $1,793,278.23. This would be all profit, and an addition to the amount of gold shipped which represents no amount paid out by the shippers. The same would apply to the other libelants in proportion to the amounts involved. It would prove a profit for the Guaranty Trust Company and to other shippers proportionately, and a corresponding loss to the ship, without any sum being paid therefor. Looking at the case from this point of view, it is incredible to suppose that, for the mere amount with reference to the Guaranty Trust Company, namely, the $9,268, damages or compensation in this large sum were ever contemplated. It is incredible to suppose that a profit and loss of such an amount was ever contemplated or agreed upon, and it cannot be recovered, of course, unless there were expressed or implied stipulations, agreed to by the parties, that it should be paid.

British & Foreign Insurance Co. v. Sanday & Co. [1916] Appeal Cases, 650, decided January 27, 1916, in our judgment disposes of any question which can be considered as left open in this case; and that is as to the effect of the usual exceptions contained in bills of lading. This case relates to this very war, and concerns what constitutes a deviation within the meaning of that exception. This case concerned two British vessels laden with merchandise for sale in Germany. While on the voyage from the Argentine to Hamburg, at the time of the declaration of war between Great Britain and Germany, the vessels shifted their courses. It was held that the voyages became illegal by force of the declaration of war, and the voyage could not lawfully be completed, and there was no deviation in law. The court was a very full court, and there was no dissent, and there can be no doubt that the position was in accordance with the law universally held. It is enough to quote Lord Loreburn (page 660) as follows:

"It was therefore a loss within the clause which insures these goods at and from losses against restraints by kings, princes, or peoples."

This case covers the only point which had not been precisely covered in the previous decisions, although they led directly up to it, namely, that obedience to an obligation which was a direct result of a condition of law arising out of the existence of war operates as a restraint precisely within these provisions, without any physical act on the part

238 F.—44

of the legal authorities. The case at bar would have been precisely within this decision if war between Great Britain and Germany had broken out before the Cecilie reached Plymouth, so that it would have been a violation of the law of Germany for her to enter that port. With that single exception the cases are precisely alike, and it certainly cannot be said that the deviation of the Cecilie, accomplished for the purpose of preventing a pending breach of German law, was not as efficient as it would have been if a deviation had occurred two or three days later. Taking the cases by and large, there cannot be said to be substantially any distinction between them.

We think 'the following impressions are enough to dispose of all the cases: Of course, the telegrams which passed between the sovereign heads of Germany, Russia, and England are matters of common knowledge with reference to an investigation of this character; and they illustrate very clearly the fact that the question of peace and war was hanging by a single thread, and it was settled overnight, or in less time than overnight. When this ship was loaded at New York, it was known that the world was on the verge of war or on the verge of peace. The voyage involved three different ports, one of which was friendly, and two of which were liable to be hostile; and it also involved the four seas, with the certainty of capture in the case of hostilities. When the ship sailed it was, of course, not known whether war would break out, or when it would break out; but, as she progressed, on her voyage of five or six days from New York, towards Plymouth, the master of the ship was in frequent communication, and getting frequent impressions, as to the probability of war or peace in various ways. As he went on his voyage the clouds thickened, and whatever hopes there might have been of peace were disappearing; and, when he was within two or three days of Plymouth, he was within the almost immediate presence of war or peace, with the practical certainty of war. His voyage, moreover, was liable to be delayed by maritime misfortunes. The dangers of navigation, and the possibility of being delayed by those dangers around the British Isles, being so considerable that it was impossible to say, except in absolutely clear weather, as to the time of arrival within one, two, or three days, or within the period which intervened between the time when he turned the ship about and the time of the actual outbreak of hostilities. All the time he was on dangerous ground, with the danger at all times increasing as he proceeded on his voyage; so that, although he sailed with a reasonable probability of peace, instead of war, the probability of war, with enemies all about him, advanced almost to a certainty before he reached the point where he changed his course. In addition to this, the whole transaction must be looked upon together, and the orders which he received not to visit any hostile port, on the 1st of August, the day after he turned his ship, were sufficiently connected with what preceded to justify his continuing his purpose to return to a neutral port, which was still incomplete. This decision should not turn on a narrow rule, as it was still in abeyance. Therefore, from any point of view, the master was justified, on receiving the telegram, on the 1st day of August, in continuing on his return voyage to a neutral port.

Here was a ship whose cargo was, perhaps, neutral; but the ship was herself advancing into the danger zone with nearly 2,000 persons aboard, many of whom might have been liable, on arrival at the first port of discharge, to an indefinite detention if the ship had been accidentally arrested. By the laws of the sea the whole is to be looked upon, ship, cargo, and passengers, as a single venture, and all resting upon the shoulders of one man—the captain. Assuming that, when he left New York, he had the prospect of a clear voyage, under the original probability that, as he advanced upon it, he might find the clouds cleared away, the events worked otherwise. He was, he testified, in constant anxiety as he advanced on account of the information which he received, and he would have been justified, on finding the increased danger, to have returned to a neutral port independently of any advices from the ship's owners.

There was no Moorish cruiser lying across his path, as there was in Driscol v. Bovil, 1 B. & P. 313 (1798), with the danger of slavery following capture, which caused the crew to refuse to sail; but there was danger of a possible, and even probable, detention of all the German passengers aboard, and the captain had as good reason for avoiding danger as there was in the case referred to, in which it was held that there was no deviation which would affect the insurance policy.

The appeal of the National City Bank affords nothing substantially different from the appeal of the Guaranty Trust Company, but it illustrates it forcibly. In the City Bank Case the amount involved was gold shipments; one of them, amounting to $2,104,254.34, to be unladen at Cherbourg for land transportation from there to Paris. This, of course, was for French delivery at a French port. If the regular course of her voyage proved without incident, the libelant estimated that the ship would have reached Plymouth before midnight on the 2d day of August, and Cherbourg early in the morning of the 3d day of August. It is maintained by the libelant that the precise time of arrival was not critical, for it says it is clear, in any event, the Cherbourg shipment would have been landed in France at least 7 hours before Germany declared war, and before France declared war upon Germany, and that, if the libelant's theory had been true, the shipment would have been landed at least 12 hours before then, and that there is, therefore, ample reason that, in either event, the Cherbourg shipment would have been landed, and the ship would have turned back, either to America, or have gone on to Bremen, not less than 6, and probably at least 12, hours before the state of peace was changed into a state of belligerency. Upon this the libelant claims that the court could assume that there would have been no act of hostility; but the question was not what the court would assume, but what hazard the master of the vessel might run. The whole of this hypothesis demonstrates to what extent the libelants were willing to drive the ship into a corner, and what computations they were making, which they were willing to impose upon her, as against the path of actual safety which she adopted.

·On Petitions for Rehearing.

BINGHAM, Circuit Judge. The plaintiffs' petitions for rehearing in Nos. 1197 and 1198, the passenger cases, must be denied.

In our opinions of November 17, 1916, it was pointed out that the actions in the passenger cases were brought on the express contracts of carriage stated in the tickets, that these contracts contained certain conditions as to notice with which the plaintiffs had failed to comply, and that, because of this failure, the actions could not be maintained.

In the cases relating to the shipments of gold the actions were also upon express contracts of carriage contained in bills of lading. In these contracts there were certain exceptions within the terms of which the claimant sought to bring itself to excuse its failure to perform the contracts; and the court held, not that the contracts or the exceptions in the contracts were displaced by the deviation of the vessel, but that, by the deviation shown, the claimant broke its contracts and failed to bring itself, by reason of its conduct, within the terms of the exceptions.

[5, 6] The plaintiffs seem to be laboring under the impression that the passenger contracts were displaced by the deviation, that thereupon the claimant became an insurer, and that these actions are based upon implied contracts of insurance due to the relationship of the parties. This is a mistaken notion. To begin with, the actions are brought, as above stated, upon express contracts of carriage, and not upon implied contracts; second, if the express contracts were displaced by the deviation, the plaintiffs would have no ground upon which they could base their actions, for the damages, if any, which they suffered, were due to breaches of the express contracts arising out of a failure to transport the plaintiffs to Plymouth and Cherbourg, and not out of injuries to their persons or property; and, third, if the express contracts were displaced by the deviation, the claimant would not thereafter become liable as insurer for injuries to the persons of its passengers, for a common carrier, in the absence of an express contract to that effect, does not insure the safe carriage of its passengers, and in such case is liable only for negligence, though as respects damage to property after deviation it would be liable as insurer. No claim is here made that the plaintiffs were damaged in their persons after deviation, or that any property which they had with them on the voyage was damaged thereafter. The class of cases relied upon by the plaintiffs, such as Morrison v. Shaw S. & A. Co., Ltd., [1916] 1 K. B. 747, are applicable only where goods are damaged after deviation, in which cases it is held that the deviation displaces the express contracts of carriage, and subjects the defendants to their common-law liability as insurers of the damaged goods.

· Petitions denied.